In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3914

MICHAEL GERMANO,

*Plaintiff-Appellant,*

*v.*

INTERNATIONAL PROFIT ASSOCIATION, INC.,
INTEGRATED BUSINESS ANALYSIS, INC., and
INTERNATIONAL TAX ADVISORS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 5638—**George W. Lindberg**, *Judge.*

ARGUED JUNE 4, 2008—DECIDED SEPTEMBER 12, 2008

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Michael Germano is a man with
a severe hearing impairment who applied for a tax
advisor position with Defendant International Tax Advi-
sors, Inc. ("ITA"). Believing that ITA rejected him for
the position because of his disability, he filed suit against
ITA in district court under the Americans with Disabil-
ities Act ("ADA"), 42 U.S.C. §§ 12111-17 (2000). He also

named as defendants other corporate entities involved in ITA's recruiting and hiring process; we refer to them collectively as ITA. The district court granted summary judgment in favor of the defendants, relying exclusively on its conclusion that the key evidence submitted by Germano in opposition to summary judgment was inadmissible hearsay. As we explain below, this was wrong. Once we restore his evidence to the picture, Germano has raised triable issues of fact with respect to each element of his discrimination claim. We therefore reverse the judgment of the district court and remand for further proceedings.

## I

As usual, in deciding whether summary judgment is appropriate, we review the court's conclusions of law *de novo* and accept the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his favor. *Lapka v. Chertoff*, 517 F.3d 974, 980-81 (7th Cir. 2008). The central question here is whether the district court should have excluded on hearsay grounds the evidence that Germano proffered; if so, the judgment for ITA stands, but if not, then summary judgment was inappropriate.

In opposing the defendants' motion for summary judgment, Germano relied in part on statements made by Ron Sage, an agent of ITA, during a telephone call between Sage and Germano. The wrinkle is this: Germano is deaf, and he thus must use a telecommunications relay service ("TRS") to communicate to persons with unim-

paired hearing over the phone. To place a call, Germano uses a text telephone to send to the TRS the phone number of the party he wishes to reach. The TRS connects Germano to the first available operator, referred to in the industry as a communications assistant ("CA"), who dials the party's number over an ordinary telephone line. When Germano wants to say something to the person he called, he sends the message in text to the CA, who reads it verbatim to that person over the phone. (People with severe hearing impairments often also have difficulty speaking aloud in a way that is fully understandable to others. See, *e.g.,* "A First Language: Whose Choice Is It?" Gallaudet Univ. Laurent Clerc National Deaf Educ. Center, at http://clerccenter.gallaudet.edu/pRODUCTS/ Sharing-Ideas/afirst/emphasis.html (last visited Aug. 25, 2008). Especially given the distortions of telephone lines, such a person might prefer to send his outgoing messages in text, as well as to receive his incoming messages in text.) When the person responds, the CA types the response verbatim in real time and sends that text to Germano. Communication proceeds back and forth in this way.

The district court held that Germano's deposition testimony about the content of the conversation that was conducted using the TRS between Sage and himself was inadmissible hearsay. If Sage and Germano had spoken to each other over an ordinary phone line as two hearing persons would have done, Germano could testify about Sage's remarks with no hearsay problems because Sage's statements would constitute admissions of a party-opponent, which are nonhearsay under FED. R. EVID.

801(d)(2)(D). The district court determined, however, that the only statements Germano perceived were those of the CA, and it found that the CA's statements were inadmissible hearsay. Whether this was correct is the question of law that is at the center of this appeal.

## II

### A

ITA begins with a familiar procedural argument: it asserts that Germano failed to raise this argument in the district court, and thus he cannot assert it here. We conclude that Germano did not forfeit the point. FED. R. EVID. 103 specifies how one should object to an erroneous ruling either admitting or excluding evidence. If the district court admits the contested evidence, the opponent must make a timely objection or motion to strike, "stating the specific ground of objection, if the specific ground was not apparent from the context[.]" Rule 103(a)(1). If, on the other hand, the district court excludes evidence that the party believes should have come in, then the only requirement is that "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Rule 103(a)(2). In either event, the court's evidentiary ruling cannot be deemed erroneous unless it affected the substantial right of the objecting party—as it surely did for Germano.

We are satisfied that Germano's offer of proof, which he included in his response to ITA's motion for sum-

mary judgment, was enough to comply with Rule 103(a)(2). ITA argued in reply to Germano's brief that Germano's testimony about the TRS conversation was inadmissible hearsay. Germano had no further opportunity to litigate the evidentiary question at that point. He did, however, attempt to present his arguments on admissibility in his motion for reconsideration. In denying that motion, the district court commented that, because Germano made a motion to supplement the record with some signature pages after ITA filed its reply, he could also have petitioned the court for permission to brief the hearsay issue that ITA had raised. Perhaps so, but there is no provision giving a right to this kind of extra briefing in the Federal Rules of Civil Procedure or the Northern District of Illinois's local rules. The court's suggestion was also inconsistent with the thrust of Rule 103(a), which relieves a party from the need to reiterate its objection or offer of proof repeatedly. Germano was entitled to, and did, raise his argument in the motion for reconsideration. In our view, that was enough.

In light of the fact that we apply *de novo* review to the grant of summary judgment as well as to the resolution of the legal issue whether a particular statement constitutes hearsay, there is no institutional reason not to reach the merits of Germano's appeal. There is also no fairness problem, because ITA had the opportunity to address the issue before the district court—indeed, it was ITA that was the first to raise it, in its reply brief on summary judgment.

B

No court of appeals has yet addressed the admissibility of a communications assistant's transmitted statements in a TRS conversation. We find, and the parties appear to agree, that the best guidance comes from cases dealing with foreign language interpreters.

Almost a century ago, in *Lee v. United States*, 198 F. 596, 601 (7th Cir. 1912), this court upheld the admission of Mr. Poy's statements, as reported by the immigration inspector who interviewed him, despite the fact that Poy was speaking through a Chinese interpreter and the interpreter did not testify about the contents of the interview. We noted that

> the law is well settled in favor of admissibility without the necessity of even calling the interpreter. When a conversation taken place between a person whose declaration is admissible in evidence and another, and they call in or assent to the use of an interpreter in order to enable them to speak with each other, each one adopts a mode of inter-communication in which they necessarily assume that the interpreter is trustworthy, and which makes his language presumptively their own.

*Id.* at 601. Although the interpreter, who did not testify about the substance of the statements, did aver that he translated correctly, this fact was not central to the reasoning in *Lee*. To the contrary, we explicitly noted that there is no need for the interpreter to testify at all. To reinforce the point, we excerpted the entire (admittedly brief) opinion in *Commonwealth v. Vose*, 32 N.E. 355 (Mass.

1892), in which the translated statements were admitted against the defendant in a criminal trial, where the French translator did not testify at all and was not a professional interpreter. The Supreme Judicial Court of Massachusetts observed that, in a conversation where parties must communicate through an interpreter,

> [e]ach acts upon the theory that the interpretation is correct. Each impliedly agrees that his language may be received through the interpreter. If nothing appears to show that their respective relations to the interpreter differ, they may be said to constitute him their joint agent to do for both that in which they have a joint interest. They wish to communicate with each other, they choose a mode of communication, they enter into conversation, and the words of the interpreter, which are their necessary medium of communication, are adopted by both, and made a part of their conversation as much as those which fall from their own lips. They cannot complain if the language of the interpreter is taken as their own by any one who is interested in the conversation. Interpretation under such circumstances is *prima facie* to be deemed correct. . . . The fact that a conversation was had through an interpreter affects the weight, but not the competency, of the evidence.

*Id.* at 355.

The only qualification that *Vose* suggested was that the presumption of correctness of the translation may be overcome by evidence that the interpreter had a special relationship with one of the parties that would indicate

a motive to translate falsely. In that situation, the interpreter cannot fairly be assumed to be the "joint agent" of the parties. See *id.*

This is consistent with the position taken by our sister circuits. Some circuits presume the admissibility of translated statements that are otherwise admissible unless there is a showing of unreliability or a motive to mislead. See *United States v. Da Silva*, 725 F.2d 828, 832 (2d Cir. 1983); *United States v. Beltran*, 761 F.2d 1, 9 (1st Cir. 1985); *United States v. Alvarez*, 755 F.2d 830, 859-60 (11th Cir. 1985). Other circuits employ a four-factor test to check for likely bias or unreliability on a case-by-case basis. See *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991); *United States v. Martinez-Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000). Such courts consider: "[1] which party supplied the interpreter, [2] whether the interpreter had any motive to mislead or distort, [3] the interpreter's qualifications and language skill, and [4] whether actions taken subsequent to the conversation were consistent with the statements as translated." *Nazemian*, 948 F.3d at 527 (enumeration added).

In Germano's case, the CA served as "no more than a language conduit" between Germano and Sage. See *Da Silva*, 725 F.2d at 832 (internal quotation marks omitted). Indeed, the term "language conduit" is an even better description of a CA than of a foreign language interpreter. Unlike an interpreter, a CA does not need to select the best word to convey a particular meaning (for example, should the English word "know" be translated in French as "*savoir*" or "*connaître*"?). The CA simply reads out the

English words from the text she sees, and then types in the English words from the voice she hears. Voice-recognition computers may some day replace the human CAs altogether, at which point there will be no technological difference between telephonic communications among hearing persons and those involving persons with impaired hearing. Currently, however, we have the human system. ITA has pointed to no evidence that would undermine the presumption of admissibility of the CA's transmitted statements, as a closer look at TRS communications shows.

First, Germano did not supply the CA. It was the independent TRS service, which operates under detailed federal regulations, that automatically connected Germano to a randomly selected operator to facilitate the TRS conversation. See 47 C.F.R. § 64.603; http://www.fcc.gov/cgb/consumerfacts/711.html.

Second, the CA had no motive to mislead or distort. ITA does not assert that the CA had any prior relationship with either party (and the chances of this are vanishingly low), nor that the CA had any motive to transmit statements inaccurately. Federal regulations require the CA to transmit statements verbatim and in real time, thus greatly reducing the chance of even unintentional distortion. See 47 C.F.R. § 64.604(a)(1)(vii), (a)(2)(ii). (We are reminded of the advertisements that a large company furnishing cellular telephone service has run from time to time, in which a man says over and over again "can you hear me now?" Far too many conventional telephone calls are marred by static or broken signals that

distort the message that reaches the listener. Those flaws go to the weight of the evidence, not to its admissibility.)

Third, the CA's qualifications and language skills are prescribed by federal regulations. CAs must "be sufficiently trained to effectively meet the specialized communications needs of individuals with hearing and speech disabilities." 47 C.F.R. § 64.604(a)(1)(i). They "must have competent skills in typing, grammar, [and] spelling" and "must possess clear and articulate voice communications." 47 C.F.R. § 64.604(a)(1)(ii). In addition, "CAs must provide a typing speed of a minimum of 60 words per minute" and the regulations require the TRS provider to administer "oral-to-type tests of CA speed." 47 C.F.R. § 64.604(a)(1)(iii). These qualifications, mandated by law, provide more assurance of reliable transmission than is often the case with lay foreign language interpreters. Thus, even if it may be harder for one to say of CAs that the parties implicitly agreed to use them as an intermediary, the strong assurances of reliability that the regulations provide for the CAs support our treating them as solely a "language conduit."

The Equal Employment Opportunity Commission, in its *amicus curiae* brief supporting Germano, stresses the fact that the governing regulations explicitly prohibit a CA "from intentionally altering a relayed conversation," and the regulations require that operators "relay all conversations verbatim unless the relay user specifically requests summarization." 47 C.F.R. § 64.604(a)(2)(ii). The Commission also notes that it would have been impossible for Germano to have acquired any record of

his conversation with Sage (even assuming he could identify which of many CAs assisted him on that day), because CAs are prohibited from "[k]eeping records of the content of any conversation beyond the duration of the call." 47 C.F.R. § 64.604(a)(2)(i). Regulations also forbid CAs from "disclosing the content of any relayed conversation," except as required by section 705 of the Communications Act, which authorizes the divulging of conversations only pursuant to subpoena or "on demand of other lawful authority." 47 U.S.C. § 605(a)(5)-(6); 47 C.F.R. § 64.604(a)(2)(i). It is not at all certain that the statutory exception encompasses discovery in civil litigation, and even if it did, it would be close to impossible for a CA to recall a single conversation from several years ago purely from memory.

Finally, it is telling that the actions ITA took after the conversation were consistent with the transmitted statements. Six days after the TRS conversation, Sage emailed Germano to notify him that ITA was not interested in pursuing employment for him. Germano inquired whether the withdrawal of the invitation to interview was related to his deafness. Sage did not respond with surprise at the premise of the question (that an interview was in fact offered), nor did he clarify any alleged misunderstanding. Indeed, he never refuted in any way Germano's assertion that Sage offered Germano an interview during the June 15 TRS conversation. The only action "inconsistent" with the interview invitation was ITA's failure eventually to interview him, and that event can be explained plausibly as the result of discrimination on the part of other decisionmakers at ITA, who learned of Germano's disability and only then withdrew the invitation.

Naturally, a finder of fact would not be compelled to find discrimination once ITA submits its evidence of the TRS conversation and the basis for its hiring decision. The reliability analysis of the CA's transmitted statements is simply a threshold inquiry to establish its admissibility. As we implied a moment ago, ITA will be free to argue that the trier of fact should not attach great weight to those transmitted statements. For now, we hold only that a certified communications assistant, transmitting statements through a telecommunications relay service, does not add a layer of hearsay, unless the opponent of that evidence can produce specific evidence of unreliability or a motive to mislead.

There are strong policy reasons for admitting testimony about the contents of TRS conversations. Congress mandated the creation of a telecommunications system for persons with hearing and speech disabilities that is "functionally equivalent" to those used by nondisabled persons. 47 U.S.C. § 225. Denying the admissibility of statements made during a TRS conversation would strip those with hearing disabilities of a vital source of evidence available to hearing persons. Deaf persons could not conduct important day-to-day affairs over the phone, such as calling the bank or the doctor, with the same ability to rely on the statements made to them by the other party that is enjoyed by hearing persons. Such a result is at odds with Congress's intent to make disabled persons full and equal participants in society. See 42 U.S.C. § 12101(a)(8).

Thus, we find no sound basis in law, fact, or policy on which to distinguish the role of communications

assistants from that of reliable, unbiased foreign language interpreters. Sage's statements, which were conveyed to Germano not solely through the movement of electrons but also through the CA's intermediation, are therefore not hearsay, and the district court erred in excluding it on this basis.

## III

With Germano's evidence about his conversation with Sage properly in the record, we must determine whether he has submitted enough evidence to survive summary judgment. Germano saw an online job advertisement, announcing that ITA was seeking applicants for the position of tax advisor. The posting noted that the minimum education requirement was a master's degree and that two to five years of relevant work experience was desired, listing examples of relevant areas, including tax, corporate, finance, estate planning, and business advising.

On June 9, 2005, in response to the posting, Germano emailed Ron Sage, one of two decisionmakers for ITA with respect to hiring, his resume and cover letter, which indicated that he had earned a J.D. from Quinnipiac University School of Law and an L.L.M. from Georgetown University Law Center, had participated in a tax clinic for two semesters, and had worked as a claims processor for two years. (Sage actually works for International Profit Association, Inc. ("IPA"), but IPA is a management consulting company to which ITA delegates some of its administrative and recruiting tasks, and so IPA is an agent of ITA.)

On June 10, Sage forwarded Germano's resume to Tim Foster (the other decisionmaker) to see if Foster had an "interest in this individual." About five days later, Sage left a voicemail on Germano's machine asking Germano to call him so that they could discuss the position of tax consultant. Germano returned Sage's call on June 15; this is the call we described earlier that was handled through the TRS and the communications assistant. Given the way the call was conducted, Sage inferred that Germano had a hearing impairment.

During the June 15 TRS call, Sage invited Germano to come to Illinois for an interview and told him that his travel expenses would be covered by ITA. He also told Germano that he would contact him again with the time and place of the interview. Afterwards, Sage told Foster that he had talked with Germano and that the use of the TRS "would imply that [Germano is] hard of hearing." During that same conversation, the decision was made not to hire Germano.

On June 21, Sage emailed Germano and said, "After further consideration, ITA has elected to pursue other candidates whose qualifications better fit the needs of the client base." The same day, Germano responded by email, stating, "I would like to inquire why I was offered an interview on Friday with your company and now it is being withdrawn. It seemed to me during our conversation on Friday that my qualifications in fact met the needs of your clients. Does the opportunity to interview being revoked pertain to my deafness?" Germano went on to explain what communications arrangements he

uses to perform daily work, informed Sage of his ability to speak and read lips, and assured Sage that the "use of an interpreter really is miniscule in comparison to my work productivity." He provided these details "to ensure that misperceptions were not the source for the interview opportunity being withdrawn." Within thirty minutes, Sage responded by email, as follows: "Honestly, the decision makers did discuss the topic of your hearing, but felt this was an obstacle that was not insurmountable. Simply stated, other candidates [*sic*] experience better fit the needs of our clients."

Germano pursued a complaint against ITA with the Equal Employment Opportunity Commission ("EEOC"). Larry Lang, Executive Director of Human Resources for IPA, told the EEOC that Germano was not hired because they decided to hire Rick Enriquez, who was more qualified. This story had its holes, however. Enriquez was offered a job with ITA on June 7 and accepted it on June 9, almost a week *before* Germano's June 15 conversation with Sage, in which he was invited to interview. ITA hired tax consultants on a rolling basis; it continued to interview and hire others after withdrawing Germano's interview offer. The EEOC investigator thought that the evidence presented "substantial credibility challenges to the Respondent's version of events and it's [*sic*] explanations for the failure to proceed with Charging Party's candidacy." After receiving his right-to-sue letter, Germano filed suit in district court against the defendants, alleging discrimination in employment in violation of the ADA.

**IV**

To survive summary judgment on an ADA discrimination claim, Germano must raise a triable issue on each element of the claim. Under the familiar *McDonnell Douglas* paradigm, Germano must show (1) that he is disabled; (2) that he is qualified by education and experience and could perform the essential job functions with or without reasonable accommodation; (3) that he suffered an adverse employment action; and (4) that the circumstances surrounding the adverse action support the inference that his disability was a determining factor behind the adverse action. *Lawson v. CSX Transp. Inc.*, 245 F.3d 916 (7th Cir. 2001); see *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1154 (10th Cir. 2008). (Although this court has sometimes described the last factor as requiring the plaintiff to show that discrimination is "more likely than not," we have spoken only of an "indication" that this is so, not a certainty. See *Lawson*, 245 F.3d at 922. That is understandable, because if we required a certainty, then the difference between direct and indirect proof would be erased. We think it is less confusing to speak, as the Tenth Circuit does, of evidence supporting an "inference" that discrimination was "a determining factor." This evidence might involve, for example, showing that similarly situated people without the same disability were treated better—a common strategy in indirect proof cases, though not the only one.)

Defendants do not contest that Germano has satisfied the first and third elements. Thus, we start by asking whether Germano has raised a factual question with

respect to his qualifications and ability to perform the job with or without reasonable accommodations.

It is beyond dispute that Germano satisfied at least the education requirements for the job. By submitting evidence that defendants offered him an interview, for which they would pay his travel expenses, Germano raises a triable issue whether he was qualified for the job. ITA might have concluded that his tax clinic and claims work were the equivalent of the experience it was looking for; alternatively, it may have considered work experience desirable, but not essential. Germano also points to two Tax Advisors who did not have at least two years of relevant work experience at the time they were hired by ITA, and ITA's admission that it considers for employment applicants who do not have at least two years of relevant work experience. A rational jury could infer that the amount of relevant work experience was simply a desirable criterion, but not a *requirement* for the job, and thus that Germano was qualified for the job.

Germano himself was competent to testify about the reasonable accommodations that would allow him to perform the essential functions of the job. In this appeal, the defendants dispute Germano's lip reading skills, the amount of time for which he would need an interpreter, and his estimates of the hourly rate charged by an interpreter. These issues are material, but they are contested, and they can be resolved only by the trier of fact.

The remaining element to be examined is the fourth one: whether circumstances surrounding the adverse action support the inference that Germano's disability was a

determining factor for ITA's decision abruptly to termi-
nate its interest in hiring him.

Germano raises a triable question by pointing to the
suspicious timing of the withdrawal of the interview
invitation (shortly after the defendants learned of his
disability, with no other new information about him)
together with the defendants' shifting explanations of
why they did not hire or interview Germano. During the
EEOC investigation, IPA claimed that Germano was not
hired because it chose a superior candidate, Enriquez, for
the position. This explanation later proved to be false,
because Enriquez accepted his position before ITA
invited Germano to interview. Later on, the defendants
asserted that they did not hire Germano because he was
altogether *unqualified* for the position, as opposed to
merely being less qualified than another specific candi-
date. They take this position in the face of the contempora-
neous evidence that they deemed Germano qualified
enough to offer him an interview at their own expense.

Under the burden-shifting framework of *McDonnell
Douglas*, once the plaintiff makes out a *prima facie* case, the
defense may offer a legitimate, nondiscriminatory reason
for having taken the adverse employment action against
the plaintiff. The burden then falls on the plaintiff to
show that the proffered reason is merely a pretext, mean-
ing that the employer itself did not believe its own story.

ITA has offered a legitimate, nondiscriminatory reason
for not pursuing Germano further: it wanted better candi-
dates. Germano, however, has pointed to evidence that
would permit a trier of fact to find ITA's reason pretextual.

For the most part, it is the same evidence we have just reviewed in connection with the fourth element of the *prima facie* case, including the circumstances of the interview offer and ITA's inconsistent explanations for its actions.

* * *

The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion. On remand, Circuit Rule 36 shall apply.