In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2768

HARRIETT ELLIS, *et al.*,

*Plaintiff-Appellants*,

*v.*

CCA OF TENNESSEE LLC, doing business as
CORRECTIONS CORPORATION OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-254—**Sarah Evans Barker**, *Judge*.

ARGUED JANUARY 10, 2011—DECIDED JUNE 9, 2011

Before FLAUM and WILLIAMS, *Circuit Judges*, and
HERNDON, *District Judge.**

FLAUM, *Circuit Judge*. The plaintiffs in this case are
former nurses who worked in the health care unit of a

* Hon. David R. Herndon, Chief Judge of the Southern
District of Illinois, sitting by designation.

privately run jail. They maintain that their employer, defendant CCA of Tennessee LLC ("CCA"), subjected them to racial discrimination and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. They also allege that their employment relationship ended when CCA constructively terminated their employment for complaining about problems at the jail, in violation of a state whistle-blower law. The district court granted CCA's motion for summary judgment. We affirm.

## I. Background

The plaintiffs are Harriett Ellis, Patricia Forrest, Shavon Jones, and Delores McNeil. All of the plaintiffs are African-American, and they all worked as nurses at a medium-security correctional facility known as Marion County Jail II. Four more plaintiff-nurses below did not appeal from the district court's summary judgment order, and so we omit them from our discussion. (Would that plaintiffs had done the same. Instead, their brief regularly refers to all of the nurses collectively, despite the individual nature of their legal claims and despite the fact that half their number have dropped out of the suit.) The jail where plaintiffs worked is managed and operated by defendant CCA, pursuant to a contract between it and the Marion County Sheriff. To staff the jail's medical unit, CCA employs a doctor, psychologists, and nurses. The staff operates under the supervision of a health services administrator.

During their tenure with CCA, plaintiffs maintain that they endured several incidents of race-based discrimina-

tion and were subjected to a hostile work environment. The first incident is an early-2005 change that CCA made to the jail's staffing policy. Prior to 2005, nurses at the jail worked in one of three permanently assigned shifts. All of the plaintiffs, or all but one—the record is not clear—, worked on the first of those shifts, the day shift. Tension arose among the shifts. Plaintiff Forrest's deposition put the situation in context:

> Q. You said everybody was talking about the fact that the first shift people thought second and third shifts were slackers, right?
>
> A. Well, we complained about that they didn't get some of the work done that we know they should have gotten done.
>
> * * *
>
> Q. And that was a commonly held belief by first-shift people?
>
> A. Yes. And I'm sure the second shift felt the same way about—in nursing, I don't care what it is . . . each shift is going to complaint about the other shift . . . . It was common in that facility for everybody to be complaining about the next shift.

There were also allegations that nurses on the first shift—that is, plaintiffs—were racists. To respond to the tension among the shifts, CCA's regional director of health services, Mary Garner, announced in early 2005 that all nurses would be assigned to rotating shifts on a month-to-month basis. That means that all nurses at various times had to work on all three shifts, and the

policy was executed such that the same nurses would not always work with one another. That makes sense; imagine that A and B work together in Week 1 and respect one another's work ethic. During a subsequent week when the two do not work together, A is less likely to complain that B is a poor worker and more likely to chalk up uncompleted tasks to a busy shift or some other irregularity.

Although the effect of the shift-change policy was to split up a predominately black shift, plaintiffs do not point to evidence that the change was made for discriminatory reasons. Indeed, the policy applied to all nurses. Rather, plaintiffs focus on how the change made them feel. Again, plaintiff Forrest: "[T]he reason we were upset about it is because of the fact that day-shift nurses were mostly black, and [Garner] . . . was splitting us up. . . . You got eight black nurses, so let's break them up so they don't have the, you know, the power."

Plaintiffs also point to a second incident of alleged racial discrimination. In April 2006, the health services administrator, Carmen Copely, left her position at the jail. Following Copely's departure, a six-page excerpt from a book about management was found in her office. *See* Kenneth Blanchard, William Oncken, Jr., and Hal Burrows, THE ONE MINUTE MANAGER MEETS THE MONKEY 5, 55, 68, 82, 94, 112 (1989). The book likens monkeys to workplace problems, as in "there is a monkey on my back." The point of the book is to teach managers to empower subordinates to solve problems—manage their own monkeys—rather than effectively morph into subordinates themselves. *Id.* at 29-30.

Nothing about the excerpt from Copely's office could reasonably convey a contrary impression. Here are the contents. Page 1 consists of a man sitting at his desk and looking rather harried. The cause is evident, for a monkey is perched on the man's shoulders, and several others are making rather a nuisance of themselves; they are fussing with papers in the man's in-box, tipping over his trash can, and warring over a telephone. Pages 2 through 4 of the excerpt contain management aphorisms, one per page. Page 2 reads, "The more you get rid of your people's monkeys, the more time you have for your people." The aphorism on page 3 reads, "All monkeys must be handled at the lowest organizational level consistent with their welfare!" Someone has underlined the printed words "lowest organizational level" and listed employee-groups within the jail—mental health, doctors and physician assistants, clerks, and nurses. The fourth page's aphorism admonishes managers to "[p]ractice hands-off management as much as possible and hands-on management as much as necessary." Here, someone has underlined "hands-off" and "hands-on." The fifth page contains a summary of "four rules for monkey management." Each of the rules explains how managers should supervise their people in addressing workplace challenges. The sixth page is bereft of primates or people and is geared toward promoting effective time-management. Even without the context provided by the book, it is clear from the excerpt that monkeys are workplace challenges, and that people—non-metaphorically referred to as "people"—are not being compared to monkeys. Within

the book's construct, bosses have people, and everyone has monkeys.

Plaintiffs feel the excerpt and marginalia are racist, and they seem to maintain that the excerpt's discovery helped spark a hostile work environment. The latter notion is conceptually sound, as writings may be used in ways unintended by authors. *See, e.g.*, Salil Tripathi, *Enraged by Madonna and Nicole*, NEW STATESMAN 28 (Sept. 20, 1999) (discussing the objection of Hindus to the use of a verse from the *Bhagavadgita* in Stanley Kubrick's *Eyes Wide Shut*). One can easily imagine that other employees in a workplace might hijack the anthropomorphic monkey management sketch and use it for racist ends. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (observing that it "has become easier to coat various forms of discrimination with the appearance of propriety" because the threat of liability takes that which was once overt and makes it subtle). Of course, the potential for expropriation does not establish that the material is racist. *Cf. id.* at 1083 (reasoning that the use of "code words," when combined with other evidence, could support an inference of racial animus). Plaintiffs claim that there was more in this case: they say that the nurses were referred to as monkeys over the jail's intercom by two different CCA employees. Plaintiffs' characterization, however, is unsupported by the record evidence that they cite. The evidence indicates that two employees used the word monkeys when they made comments over the jail's intercom. However, the record does not indicate that the word was used to refer to nurses or any subset of nurses (*e.g.*, plaintiffs, as op-

posed to all of the workers at that jail), nor does the record put the statements in any kind of meaningful context.

Subsequent to the incident involving the management excerpt, one of the plaintiffs observed workers at the jail wearing clothing emblazoned with symbols of the confederacy. Specifically, in September 2006, plaintiff Ellis observed a jail employee wearing a T-shirt that contained a representation of a confederate flag on it.[1] The employee was not one of Ellis's supervisors nor did the employee supervise any other plaintiff. Ellis reported the incident, and the record appears to be silent as to what response, if any, was made by CCA. On a separate occasion, too, Ellis observed a different employee wearing a shirt decorated with the confederate flag. That employee also was not a supervisor of Ellis or other nurses, and the response of management is under-specified in the record (although it appears limited disciplinary action was taken).

The final incident related to discrimination that plaintiffs highlight is an encounter that plaintiff Jones had with a doctor at the jail. The timing of the event has not been made clear. At some point, Jones was talking with a doctor about an inmate at the jail whose last name was Cole. Jones asked what the inmate's first name was, and the doctor replied either that the first name was "black as coal" or that it was "black ass coal." Jones filed a complaint against the doctor after the incident,

---

[1] Another of the nurses who did not appeal the district court's summary judgment ruling also saw the employee in question.

and management gave a copy of the complaint to the doctor. The doctor apologized to Jones but in doing so told her that she should let the doctor know directly if he said anything offensive. Jones, apparently unhappy that the written complaint was turned over to the doctor, filed another complaint alleging that she was experiencing a hostile work environment. (The response, if any, to the follow-up complaint is not included in the record.)

The discrimination that plaintiffs contend they suffered was not the cause of their departure from CCA. Rather, they say they were constructively discharged for being whistleblowers. Plaintiffs contend they were retaliated against after complaining about privacy violations, improper alterations of medical records, improper handling of inmate complaints, and medication errors. Their briefing is less than clear as to precisely what retaliatory acts CCA undertook, and the matter has not been teed up by the parties. Plaintiff Ellis says that she was suspended for reporting (internally) another nurse's medical errors. Plaintiff Jones was given a "disgusted look" by health services administrator Copely at one point. Those are the only specific alleged incidents of retaliation that plaintiffs highlight (or we perceive), although plaintiffs also contend that the 2005 shift-change policy was an act of retaliation.

Eventually, plaintiffs decided they could no longer work at the jail. In September 2006, plaintiff Jones resigned her employment, stating in a written communication to the health services administrator that the

decision was due to "intolerable working conditions." Plaintiffs Ellis and Forrest resigned a few weeks later. Plaintiff McNeil resigned the following January; her resignation letter relied primarily on professional violations that she observed, indicating that she would put her nursing license in jeopardy if she remained. She also stated that she experienced "racial and discriminatory conditions."

After they quit, plaintiffs filed suit and their operative complaint comprised twelve counts. CCA moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. In its order granting that motion, the district court concluded that plaintiffs failed to create jury-triable issues on their claims of federal employment discrimination and state-law retaliatory discharge. (The district court granted summary judgment on the other claims, and plaintiffs do not appeal those rulings.) In addition, the district court ruled that plaintiff Forrest's lawsuit was barred by the doctrine of claim preclusion, also known as *res judicata*.

## II. Discussion

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A summary judgment motion is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive summary judgment, a non-movant must be able to show that a reasonable jury could return a verdict in its favor—metaphysical doubt as to the material facts does not create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Our review is de novo: we accord no deference to a district court's determination that the requirements of Rule 56(a) have been met. *Clifford v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 271 n.5 (7th Cir. 2010). The same holds true for the district court's determination (or apparent determination) that some of plaintiff Forrest's case is barred on claim preclusion grounds. *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 998 (7th Cir. 2000). Nonetheless, we may affirm on any basis fairly presented in the record. *In re Airadigm Communications, Inc.*, 616 F.3d 642, 652 (7th Cir. 2010).

Although the district court correctly determined that there was no genuine issue of material fact related to plaintiffs' legal claims, the district court erred with respect to its claim preclusion ruling. That error, however, was harmless, and we therefore affirm the district court's judgment.

## A. Hostile Work Environment

We will start with plaintiffs' hostile work environment claims. The claims were brought under Title VII of the

1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. In seeking to establish the existence of a hostile work environment, plaintiffs must show that their work environment was both objectively and subjectively offensive—that is, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining whether an environment is sufficiently hostile to support a claim, the Supreme Court has instructed us to cast a wide net and consider the totality of the circumstances. The circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787-88 (quotation marks omitted). To qualify as a hostile work environment, the conduct at issue must be severe or pervasive enough to cause psychological injury, although Title VII "comes into play before the harassing conduct leads to a nervous breakdown." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). In addition to showing that the environment was sufficiently serious, the plaintiff must show that the harassment was based on membership in a protected class, *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002), and also that there is a basis for imputing liability to the plaintiff's employer. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

Plaintiffs have not created a genuine dispute for trial. They maintain that "[v]erbal and written derogatory references to 'monkeys,' confederate flag garb, skin-

color comments, and disparate discipline and treatment based on race are not the characteristics of a civil, non-discriminatory work environment hospitable to African-Americans." We agree with the notion, but it is not supported by record evidence in this case.[2]

As to the materials excerpted from THE ONE MINUTE MANAGER MEETS THE MONKEY, we will take as a given that plaintiffs found the material subjectively hostile. Their case founders on the objective component—that is, what a reasonable person would find offensive or hostile. The book is plainly directed at management concerns, and the metaphor employed by the book (monkeys represent workplace problems) is unlikely to cause confusion. *Compare, e.g.,* Patrick White, *The Key in "Ulysses,"* 9 JAMES JOYCE Q. 10 (Fall 1971). Moreover, the management book is a spin-off of a classic article that was first published in the Harvard Business Review in 1974. *See* William Oncken, Jr., and Donald L. Wass, *Management Time: Who's Got the Monkey?*, 99 HARV. BUS. REV. 178 (1999) (reprinting the article as a "classic" and noting that

---

[2] As we noted at the outset, plaintiffs unhelpfully treated themselves as one person throughout much of their briefing, just as they did before the district court. In the context of a hostile work environment claim, secondhand harassment is less severe than firsthand harassment. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002). For the sake of our ease only, we have generally indulged plaintiffs' fiction that the nurses were effectively a single entity, but we underscore that the briefing gambit should be avoided by litigants.

it "has been one of the publication's two best-selling reprints ever"). In *Gregory v. Widnall*, the Ninth Circuit concluded that a hostile work environment claim did not raise a jury issue where supervisors had received a "single drawing of a monkey on a memo . . . accompanied by the verbal explanation that it was intended to remind [supervisors] not to 'get the monkey off their back' by passing their responsibilities to others." 153 F.3d 1071, 1074-75 (9th Cir. 1998). That conclusion is sound. The mere presence of THE ONE MINUTE MANAGER MEETS THE MONKEY at the jail not only fails to create a hostile work environment under our case law, *e.g.*, *Coolidge v. Consolidated City of Indianapolis*, 505 F.3d 731, 734 (7th Cir. 2007) (ruling that "brief and not particularly severe" exposure to pornography depicting necrophilia did not create a hostile work environment at a crime lab), it fails to *tend* to establish a hostile work environment. Similarly, the stray comments over the jail intercom do not help plaintiffs' case, at least not on the record before us. It appears only that the word monkey was used over the intercom, but plaintiffs have provided no context. The word might have been used to mock the jail's administrators, to refer to all workers collectively, or for some other purpose altogether. The vague record evidence tells us only that the word was uttered; no other inference is reasonable. To be sure, we agree with the statement of one of our sister circuits that "[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast . . . is degrading and humiliating in the extreme." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006). A

reasonable trier of fact, however, could not conclude that such a suggestion was made in this case.

That leaves plaintiffs with two incidents of an employee wearing clothing marked by the confederate flag, as observed by plaintiff Ellis, and a doctor's offensive statement to plaintiff Jones that an inmate named Cole's name was "black ass coal" or "black as coal."[3] The Supreme Court teaches that isolated incidents, unless "extremely serious," will not support a hostile work environment claim. *Faragher*, 524 U.S. at 778. That makes sense, because in order to be actionable under the pertinent statutes, isolated incidents must be so severe that they "amount to discriminatory changes in the terms and conditions of employment*." Id.* (quotation marks omitted); *see also* 42 U.S.C. 2000e-2(a)(1); 42 U.S.C. § 1981(b). Although we do not appear to have decided the matter previously, we agree that displays of confederate flags in the workplace may support a hostile work environment claim. *See Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 938-39 & n.2 (8th Cir. 2010). Nonetheless, in situating plaintiffs' allegations among the case-law guideposts, their limited number of claims are insufficiently severe to support a hostile work environment claim. *Compare Whittaker v. N. Ill.*

---

[3] Plaintiffs also bring claims based on discrete acts of discrimination, and they rely on these incidents in support of their hostile work environment claims. Yet, as we discuss below, the record evidence does not support plaintiffs' characterization, and so we omit the discrete acts of discrimination from our discussion here.

*Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) ("An objectively hostile work environment will not be found where most of the conduct that forms the basis of a plaintiff's claim consists of derogatory statements made by supervisors or co-workers out of her hearing, and the rest is isolated and not particularly severe.") (quotation marks and alterations omitted); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271-72 (7th Cir. 2004) (unambiguously racial and offensive epithets did not create a genuine issue, given that epithets were used once, long in the past); and *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (handful of offensive comments, most of which were by fellow employees over a year-and-a-half period, were not sufficient to raise a jury issue), *with Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008) ("[A]ssaults within the workplace create an objectively hostile work environment for an employee even when they are isolated."); and *Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407-08 (7th Cir. 2005) (genuine issue for jury based on inappropriate comments and "serious physical violations"). Even indulging plaintiffs' imprecise briefing, which treats all plaintiffs the same, the incidents they cite do not entitle them to a trial.

## B. Other Race-Based Claims

Plaintiffs' other race-based claims, alleging discrete acts of discrimination, fare no better. They proceed under the indirect method of proof announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The indirect method is a summary judgment filtering device that

allows a plaintiff to make out a prima facie case of discrimination. The burden then shifts to the defendant to advance a non-discriminatory explanation for its conduct, and shifts back to the plaintiff to adduce evidence that the defendant's explanation is a lie.

To make out a prima facie case of racial discrimination under the indirect method of proof, plaintiffs must (among other things) identify an adverse employment action. *McGowan v. Deere & Co.*, 581 F.3d 575, 578 (7th Cir. 2009) (burden-shifting analysis generally works the same under Title VII and § 1981). To qualify as adverse means materially adverse, "not merely an inconvenience or a change in job responsibilities." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *see also Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001) (noting that courts have talked about materiality in different ways but noting that to qualify as a change to "terms, conditions, or privileges" of employment within Title VII's meaning requires an impact on plaintiff's job "in a real and demonstrable way"). In other words, the change needs to be significant, although exactly what that means will vary on the facts of a given case. *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744 (7th Cir. 2002) (discussing three types of adverse actions that have supported claims).

Plaintiffs point to four actions on appeal that they say were materially adverse: (1) the 2005 shift-change policy, (2) a three-day suspension received by plaintiff Ellis, (3) restrictions on "lunch break associations," and (4) their constructive discharge. We can jettison plain-

tiffs' cryptic lunch plaints with basically no discussion because the allegations were made by, and relate to, nurses who did not appeal from the district court's summary judgment ruling. The other claimed adverse actions are properly before us, but do not support viable claims.

The 2005 shift-change policy does not qualify as materially adverse on these facts. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (plaintiff could maintain a retaliation suit based on shift changes given that the defendant knew the plaintiff's son had a medical condition so that a 9-to-5 schedule "was a materially adverse change for her, even though it would not have been for 99% of the staff"). A change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment. *E.g.*, *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (no adverse employment action where change in shift was not accompanied by a reduction in pay or significantly diminished job responsibilities). With respect to plaintiffs Ellis, Forrest, and Jones, they do not point to any "objective hardship" that indicates that the change might qualify as materially adverse. *Herrnreiter*, 315 F.3d at 744. And only on appeal have plaintiffs contended that family considerations made the shift-change materially adverse for plaintiff Ellis. They never made that argument to the district court, and so the issue has been waived. *Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010).

Likewise, Ellis cannot prevail on her claim of discrimination based on her three-day suspension, an incident she

also points to in her state-law retaliation claim. Ellis and Forrest were both punished for investigating a third nurse's medication errors. The nurse in question felt harassed, and the parties dispute whether Ellis was told that higher-ups, not Ellis, would address the matter. There is no question that the suspension could qualify as an adverse employment action. However, plaintiffs fail to show that CCA's explanation is pretext. Under the indirect method of proving a discrimination claim, a plaintiff first establishes a prima facie case of discrimination (an adverse employment action is one of the elements, and we will assume the others). After the plaintiff makes out a prima facie case, the burden shifts to the employer to articulate a non-discriminatory explanation for its conduct. If the employer does so, the burden shifts back to the plaintiff to show that the explanation is pretextual. *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 807 (7th Cir. 2008). Here, the district court reviewed the record evidence and concluded that "CCA has established that its practice was to discipline Caucasian employees as well as African American employees for similar activities . . . . Plaintiffs are left merely to speculate as to the reasons they were disciplined, stating that they 'believe' their discipline was pretextual without ever providing a factual foundation for that belief." App. 30. We agree.

Finally, plaintiffs' constructive discharge claim cannot succeed. Establishing constructive discharge is more difficult than establishing a hostile work environment. *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401-02 (7th Cir. 2010). The failure of the latter thus dooms the former. *Id.*

### C. State Law Whistleblower Actions

Plaintiffs maintain that they were intimidated, retaliated against, and had their employment constructively terminated for following their professional nursing ethical obligations by complaining about safety practices at the jail. According to them, CCA's conduct violated IC 22-5-3-3 (the "Act"), a statutory whistleblower provision. CCA contends that plaintiffs' whistleblower claims cannot move forward because plaintiffs fail to point out a violation of law, which is a prerequisite to a claim under the statute, and because plaintiffs failed to submit written complaints to an appropriate state agency or official. We evaluate the arguments on a nearly clean slate; Indiana Courts have had limited occasion to interpret the Act. *Coutee v. Lafayette Neighborhood Housing Servs., Inc.*, 792 N.E.2d 907, 912 (Ind. Ct. App. 2003). While concerns over federalism lead us to tread lightly when interpreting matters of state law, the task before us is relatively simple and Indiana courts look to basic tools of statutory interpretation, *see, e.g.*, *Estate of Moreland v. Dieter*, 576 F.3d 691, 695 (7th Cir. 2009) ("In Indiana, the lodestar of statutory interpretation is legislative intent, and the plain language of the statute is the best evidence of that intent.") (quotation marks and alterations omitted). Our task is to "deduce, as closely as possible, how the Indiana Supreme Court would rule." *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 720 (7th Cir. 2004). We agree with CCA that plaintiffs do not point to a violation of law on which to hang their whistleblower claims. Because that resolves

the matter, we decline to reach the parties' arguments regarding the Act's writing requirement.

As ever with matters of statutory interpretation, we start with the Act's language. The Act protects employees from certain forms of retaliation, where their employers are under public contract.[4] In pertinent part, the provision at issue provides:

> (a) An employee of a private employer that is under public contract may report in writing the existence of:
>
>> (1) a violation of a federal law or regulation;
>>
>> (2) a violation of a state law or rule;
>>
>> (3) a violation of an ordinance of a political subdivision (as defined in IC 36-1-2-13); or
>>
>> (4) the misuse of public resources;
>
> concerning the execution of public contract first to the private employer, unless the private employer is the person whom the employee believes is committing the violation or misuse of public resources. In that case, the employee may report the violation or misuse of public resources in writing to either the private employer or to any official or agency

---

[4] Proscribed forms of retaliation include termination of employment. IC 22-5-3-3(b). We assume without deciding that Indiana Courts would allow for a whistleblower action to be maintained under the code based on a constructive discharge theory. *See Tony v. Elkhart County*, 851 N.E.2d 1032, 1040 (Ind. Ct. App. 2006) (discussing the requirements for a constructive retaliatory discharge claim under the common law).

> entitled to receive a report from the state ethics commission under IC 4-2-6-4(b)(2)(G) or IC 4-2-6-4(b)(2)(H). If a good faith effort is not made to correct the problem within a reasonable time, the employee may submit a written report of the incident to any person, agency, or organization.

IC 22-5-3-3(a). The protections of the Act do not attach unless and until the employee files a "written report of the [complained of] incident to any person, agency, or organization." IC 22-5-3-3(b).

In this case, plaintiffs filed internal reports primarily about safety practices at CCA. However, plaintiffs have not told us what state or federal laws were violated by the conduct they observed. The Act by its terms covers violations of federal laws or regulations, state laws or rules, and ordinances, as well as the misuse of public resources. IC 22-5-3-3(a)(1)-(4). A whistleblower has to complain about such a violation or misuse of public resources before the Act's protections are triggered. Here, plaintiffs point out no violation of a state law or rule, or anything else within the Act's ambit. Instead, they rely on *their* obligations as practical nurses, under 848 Ind. Admin. Code 2-3-2(10) (standards for practical nurses), to report to their bosses or state officials unprofessional conduct that may jeopardize patient safety. Ironically, by filing a report, plaintiffs ensured that there was no violation of state law, and they have not argued that the subject matter of their complaints fell within the coverage of the Act. Therefore, summary judgment on the plaintiffs' whistleblower claims was appropriate.

**D. Claim Preclusion**

We do agree with plaintiffs that the district court erred with respect to its claim preclusion ruling. Although the parties have not done much to clarify matters, some of plaintiff Forrest's allegations were made in an earlier (unsuccessful) federal lawsuit. The district court appeared to rule that all of Forrest's second lawsuit was barred under the doctrine of claim preclusion, also known as *res judicata*. The district court, relying on dicta from *Zurich Capital Markets Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1047 n.2 (N.D. Ill. 2005), reasoned that Forrest could have amended her complaint in the earlier suit to allege conduct that occurred between the time when she filed suit and the time when CCA moved for summary judgment. That conclusion did not accurately reflect our case law.

The preclusive effect of a federal court decision is a matter of federal common law. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). The federal rule is that claim preclusion generally does not bar a subsequent lawsuit for issues that arise after the operative complaint is filed. *See Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 914-15 (7th Cir. 1993) ("[P]laintiffs need not amend filings to included issues that arose after the original suit is lodged."); *Spiegel v. Cont'l Ill. Nat'l Bank*, 790 F.2d 638, 646 (7th Cir. 1986); *see also* 18 Wright, Miller, & Cooper, FEDERAL PRACTICE AND PROCEDURE § 4409, at 213 (2d ed. 2002) ("Most cases rule that an action need include only the portions of the claim due at the time of commencing that action, frequently observing that the opportunity to file a supple-

mental complaint is not an obligation."); *id. at* 213-16 (noting that an unsuccessful attempt to amend a complaint requires "careful analysis to determine whether the attempt was rejected on grounds that should preclude a later attempt to resurrect the matters excluded from the first action").

That does not end matters, however. Plaintiffs do not argue that Forrest's claims differ on the merits from the rest of the plaintiffs' claims. The district court's error on claim preclusion was harmless. *See* Fed. R. Civ. P. 61. In addition, we note that, on the facts and arguments presented, the district court did an admirable job of addressing the many issues in the case.

### III.  Conclusion

For the reasons set forth above, the judgment of the district court is AFFIRMED.