In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 21-2496

NAZARIY LESIV,

*Plaintiff-Appellant*,

*v.*

ILLINOIS CENTRAL RAILROAD COMPANY,
doing business as CANADIAN NATIONAL RAILWAY,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-00854 — **Gabriel A. Fuentes**, *Magistrate Judge*.

───────────────

ARGUED JANUARY 13, 2022 — DECIDED JULY 13, 2022

───────────────

Before HAMILTON, BRENNAN, and JACKSON-AKIWUMI, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal presents retaliation claims under Title VII of the Civil Rights Act of 1964. Plaintiff-appellant Nazariy Lesiv works for the Illinois Central Railroad Company. His brother, Lyubomir, had also worked there but left shortly after he filed a discrimination and retaliation charge against Illinois Central. Lyubomir later filed a

discrimination suit in state court. As a witness in that suit, plaintiff Nazariy Lesiv (whom we refer to as Lesiv in this opinion) testified in a deposition in 2018. Then, almost three months after Lesiv testified, his supervisors gave him a dangerous work assignment and suspended him after he refused to complete it.

Lesiv asserts that Illinois Central violated Title VII in two ways. The first is a theory of direct individual retaliation: Lesiv contends his supervisors subjected him to these adverse actions because he testified in his brother's lawsuit. See 42 U.S.C. § 2000e-3(a) (unlawful for employer to discriminate against employee because he has "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"). The second is a theory of third-party retaliation: Lesiv argues his supervisors also took these actions against him as a way to harm his brother in retaliation for his brother's filing of a charge against the company and later suing. See *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011) (recognizing third-party retaliation claims under Title VII).

The district court granted summary judgment for Illinois Central on both claims. We affirm, but without endorsing all of the district court's reasoning. A retaliation claim requires proof that the employer took a "materially adverse" action against an employee because he engaged in protected activity or because another person close to him did so. A jury could find here that both the dangerous work assignment and the suspension amounted to materially adverse actions. But on this record, a jury could not find retaliatory motives here. Lesiv has not presented evidence that his supervisors took these actions against him *because* of his or his brother's protected

activities. Part I presents the material facts, summarizes the proceedings in the district court, and explains the summary judgment standard that we apply here. Part II addresses Lesiv's individual retaliation claim. Part III analyzes his third-party retaliation claim.

I.  *Factual and Procedural Background*

We present the facts that follow in the light reasonably most favorable to Lesiv, giving him the benefit of conflicts in the evidence and drawing all reasonable inferences in his favor. *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019), quoting *Stokes v. Board of Education of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010).

A.  *Facts for Summary Judgment*

Illinois Central employs Lesiv as a carman (a person who repairs railcars, among other tasks). Lesiv's brother Lyubomir also worked for Illinois Central as a carman until sometime in 2016. Before leaving, however, Lyubomir filed with federal and state agencies a charge against Illinois Central for discrimination based on national origin, perceived sexual orientation, and/or race, and for retaliation. After the state agency dismissed the charge, Lyubomir filed a lawsuit in state court in July 2017. Lesiv was a witness in that lawsuit and testified in a deposition in April 2018. Critically, however, Lesiv has not submitted evidence that his supervisors who took action against him in the summer of 2018 were aware of his testimony.

In July 2018, almost three months after his deposition, the events that gave rise to this appeal occurred. To start, on July 6th, Lesiv and supervisor Anthony Grayer got into a heated confrontation over work that was unfinished at the end of

Lesiv's shift. By Lesiv's account, Grayer jabbed Lesiv twice in the chest, prompting Lesiv to tell Grayer to "keep his hands off him." Another employee intervened and separated the two of them. That night, Grayer sat down to make work assignments for the next day, including Lesiv's next shift.

Grayer assigned Lesiv to work the "RIP track." Grayer explained later that he gave Lesiv the RIP track assignment because he "had an attitude the day before." Working on the RIP track can be dangerous. It entails heavy repairs, like wheel replacements on railcars, which can weigh over five tons and up to a hundred tons if loaded. Most of the RIP track repairs require more than one carman to complete safely, so people are assigned to work the RIP track in teams of two.

That day, Grayer assigned Lesiv to work the RIP track alone. Illinois Central contends that Lesiv was never actually scheduled to work the RIP track by himself. Its version is that the partner he was supposed to work with called off work at the last minute. Lesiv testified that he was aware that another employee had called off work, but no one told him that that other employee was assigned to work with him on the RIP track. Moreover, Illinois Central agrees that the relief supervisor told Lesiv that he still had to work the RIP track without a partner. When Lesiv asked who his partner was, the supervisor responded, "I have nobody," and that "Anthony Grayer told me that's where you are going to work." Illinois Central further contends that Lesiv did not give the relief supervisor the chance to give Lesiv a new partner or explain the situation. But Lesiv asserted in his deposition that the relief supervisor never clarified throughout their entire interaction that he

originally had a partner. On summary judgment, of course, we must credit Lesiv's evidence.[1]

Lesiv refused to comply because he thought the assignment was unsafe. He asked the relief supervisor to call Grayer so that he could give Lesiv a different assignment. With Grayer unavailable, Lesiv eventually spoke with Mechanical Manager Dan Duggan and told him about the situation. Duggan suggested Lesiv work the speedy track instead. (The speedy track involves light repairs that one carman can safely do alone.) Lesiv agreed, but that never happened.

Instead, during the call, Lesiv told Duggan about his interaction with Grayer the day before. Lesiv then gave the telephone to the relief supervisor and left to retrieve his equipment. But before he could actually start work on the speedy track, the relief supervisor told him that Duggan wanted him to write a statement about his confrontation with Grayer. Lesiv complied with the request.

Duggan then spoke with Lesiv again and explained that he was being removed from service for being insubordinate. The supposed insubordination was Lesiv's behavior toward the relief supervisor when he refused to work the RIP track by himself and his manner in speaking with Duggan on the telephone. (Lesiv acknowledges that his voice may have been "loud" during his initial conversation with Duggan.) At that time, Lesiv understood the suspension to be without pay and

---

[1] Lesiv's account is also consistent with his statement to human resources on July 8, 2018. In that email, he explained that when he asked the relief supervisor who his partner was for the RIP track assignment, the supervisor responded: "[L]ook this is not my call, Anthony Grayer ordered it, you will be working alone."

for an indefinite time. Lesiv returned to work on July 12th after missing two days of work and received backpay to compensate him for his lost wages. The parties do not indicate whether the two days of missed pay actually came out of one of Lesiv's paychecks before he received the backpay. In the district court, however, Illinois Central argued only that the suspension did not amount to a materially adverse action because Lesiv received backpay, without offering evidence of how quickly Lesiv received backpay. We will not speculate in favor of the party who moved for summary judgment. It is enough for the purposes of summary judgment that Illinois Central agrees the suspension was for an indefinite period of time, as it confirmed at oral argument, and that Lesiv later received backpay, which means the suspension was not paid from the outset.[2]

Lesiv was not the only employee who refused a work assignment during these two days. On July 6th, the same day Lesiv had his altercation with Grayer, Paul Barwan was assigned to work the "A yard" with a partner. (The A yard involves both heavy and light repairs.) He objected immediately: "F*** you. I am not doing that job." The relief supervisor informed Duggan of this interaction a few days later. Unlike in Lesiv's case, Duggan did not suspend Barwan.

---

[2] As part of the collective bargaining agreement between Illinois Central and its employees' union, Lesiv faced an investigation into these incidents and his actions to determine whether he committed any rules violations. The investigative panel concluded that Lesiv should not face any discipline.

B.  *Procedural History*

After these events took place, Lesiv sued Illinois Central for retaliation under Title VII and the Illinois Human Rights Act. See 42 U.S.C. § 2000e–3(a); 775 ILCS 5/101 et seq. He alleged that Illinois Central retaliated against him for testifying in his brother's lawsuit by giving him a dangerous work assignment and suspending him. Lesiv also advanced a theory of third-party retaliation. He asserted that Illinois Central also acted against him to punish his brother for filing a discrimination charge and the later lawsuit against the company, and that Lesiv had standing to bring such a claim under *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011) (recognizing such third-party retaliation claims).

Illinois Central moved for summary judgment. The magistrate judge, presiding by consent under 28 U.S.C § 636(c), granted the motion. The judge found that a reasonable jury could not conclude that Lesiv was subject to a materially adverse action. The judge also found that even if a jury could consider an action materially adverse, it could not find a causal connection between Lesiv's protected activity and any of the actions taken against him by his supervisors. The judge also rejected Lesiv's third-party retaliation claim. Lesiv has appealed on both theories of retaliation.

C.  *Standard of Review*

We review de novo the grant of summary judgment to Illinois Central, and as stated, draw from the evidence all reasonable inferences in favor of Lesiv. *Palmer*, 928 F.3d at 565. "Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Poullard v. McDonald*, 829 F.3d

844, 852 (7th Cir. 2016), citing Fed. R. Civ. P. 56(a). To survive summary judgment, Lesiv "must be able to show that a reasonable jury could return a verdict in [his] favor." *Benuzzi v. Board of Education of City of Chicago*, 647 F.3d 652, 662 (7th Cir. 2011). If Lesiv is not able to "'establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial,' summary judgment must be granted." *Id.* (internal citation omitted), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We address Lesiv's individual retaliation claim and then his third-party claim.

## II. *Individual Retaliation Claim*

Title VII prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *Igasaki v. Illinois Dep't of Financial and Professional Regulation*, 988 F.3d 948, 959 (7th Cir. 2021), quoting 42 U.S.C. § 2000e-3(a). To defeat summary judgment, Lesiv must offer evidence from which a reasonable jury could find: "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

The evidence presented "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself …. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Ultimately, the inquiry comes down to one question: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused" the materially adverse action? *Lord v. High Voltage*

*Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Lesiv engaged in statutorily protected activity by testifying in his brother's discrimination lawsuit. Our analysis focuses on the requirements for a materially adverse action and causation. We address each in turn.[3]

### A. *Materially Adverse Action*

For a retaliation claim, a materially adverse action is defined as an action "that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Poullard*, 829 F.3d at 856. That standard is easier to satisfy than the comparable standard for Title VII discrimination claims, which is "limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006). Still, even for a retaliation claim, the actions must rise above "trivial harms," such as "petty slights or minor annoyances that often take place at work and that all employees experience," which do not qualify as materially adverse. *Id.* at 68. Context is often key in distinguishing between material actions and petty

---

[3] In *Ortiz*, we directed district courts to stop focusing on the difference between direct and indirect evidence of employment discrimination and to consider the evidence as a whole instead. 834 F.3d at 763–65. We have since clarified that a plaintiff can still invoke the *McDonnell Douglas* framework to evaluate circumstantial evidence. See *Lewis*, 909 F.3d at 867 ("We did not reject or alter the *McDonnell Douglas* burden-shifting framework in *Ortiz*; we simply clarified that there are not separate classifications of evidence to be evaluated under different standards, and we eliminated unhelpful surplus tests."); see also, e.g., *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (plaintiff invoked the burden-shifting framework of *McDonnell Douglas* to bring a retaliation claim). Lesiv has not invoked *McDonnell Douglas* here.

slights. See *id.* at 69 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances.").

As we focus on this element of Lesiv's claim, we must assume the employer acted with a retaliatory motive. Illinois Central is arguing that even if Lesiv could prove that it acted because Lesiv testified in his brother's lawsuit, assigning Lesiv to work the RIP track alone and suspending him without pay after he refused would not be actionable. The question is whether a reasonable jury could find that either of those actions would dissuade a reasonable employee from engaging in protected activity in the future. The answer is yes for each action.

### 1. *The Dangerous Assignment*

Grayer assigned Lesiv to work the RIP track as punishment. While the parties dispute whether Lesiv had a partner when Grayer made the assignment, the parties agree that the relief supervisor ordered Lesiv to work the RIP track alone. And as Lesiv testified, the relief supervisor never clarified that he had a partner originally as they tried to contact Grayer, spoke with Duggan, or after he completed his statement about his confrontation with Grayer. As noted above, carmen do not work the RIP track by themselves, and doing so could be dangerous. Putting these facts together and giving Lesiv the benefit of conflicting evidence on summary judgment, the relief supervisor directed Lesiv to work an unusual and inherently dangerous assignment that Grayer himself described as punitive.

Such an unusual and dangerous work assignment can qualify as a materially adverse action. We have held that a

jury could find that retaliating against an employee by assigning her unusually dangerous duty would deter a reasonable employee from engaging in protected activity. In *Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007), a police officer sued for retaliation. She offered evidence that after she complained of discrimination, she was singled out for inherently more dangerous work assignments. We reversed summary judgment for the employer, finding that the dangerous assignments could amount to materially adverse actions. *Id.* at 655. Similarly here, by providing evidence that he was singled out for an unusually dangerous work assignment, Lesiv met his burden for defeating summary judgment on this issue. Accord, *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (reversing summary judgment for employer; change in work schedule that resulted in more dangerous work assignment could qualify as materially adverse employment action).[4]

Illinois Central's attempt to distinguish *Lewis* is not persuasive. It points out that the *Lewis* plaintiff actually worked the dangerous assignments while Lesiv never ended up completing his. The argument overlooks why Lesiv did not end up working the RIP track by himself: *he* refused and was later suspended for that refusal. Granted, Duggan ultimately suggested that Lesiv work the light track, but that was not until

---

[4] At the later trial in *Lewis*, the jury found for the employer on the retaliation claim, and we affirmed. We determined that a reasonable jury could conclude that the actions Lewis complained of were not inherently more dangerous than her prior assignments and were "merely part of her job." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 445 (7th Cir. 2009). The fact that the jury later decided against Lewis has no bearing on whether a reasonable jury also could have found in her favor. A disputed fact is one that a jury could—but is not required to—find for the non-moving party, as *Lewis* illustrates.

after Lesiv refused to work the RIP track alone and demanded to speak to someone other than the relief supervisor about the situation. Illinois Central proposes a rule under which, if an employee refuses a dangerous retaliatory assignment, the employer could avoid liability as a matter of law even if the employer then punished the employee for refusing the dangerous retaliatory assignment.

We reject that proposed rule. The Supreme Court has cautioned against categorical rules for retaliation claims. See *Thompson*, 562 U.S. at 175 ("Given the broad statutory text and the variety of workplace contexts in which retaliation may occur, Title VII's antiretaliation provision is simply not reducible to a comprehensive set of clear rules."); *Burlington Northern*, 548 U.S. at 69 ("[A] legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others." (internal citation and quotation marks omitted)). Courts need to focus on whether, under the particular circumstances, a reasonable jury could find that the employer's actions would dissuade reasonable employees from asserting rights under Title VII. Having to choose between insubordination and an unreasonably dangerous assignment could produce such dissuasion. At the very least, the question should be left for a jury to decide.[5]

---

[5] To be sure, we have held that unfulfilled threats do not typically constitute materially adverse actions. See, e.g., *Poullard*, 829 F.3d at 856–57 (threats of unspecified disciplinary action did not constitute adverse actions); see also *Lewis*, 909 F.3d at 870 (collecting cases). Those cases are readily distinguishable from the facts here. First, in this case, it was the employee—not the employer—who stopped the adverse action from materializing. Viewing the facts most favorable to Lesiv, we assume that Grayer did not intend merely to threaten this assignment but instead

2. *The Suspension*

After Lesiv refused to work the RIP track, he was suspended indefinitely without pay for insubordination. It is well-established that unpaid suspensions can constitute materially adverse actions for retaliation claims. See, e.g., *Burlington Northern*, 548 U.S. at 72–73 (jury made a reasonable conclusion that an unpaid, indefinite suspension lasting thirty-seven days was materially adverse); *Whittaker v. Northern Illinois University*, 424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay … would constitute an adverse employment action.").[6]

Illinois Central's attempts to dismiss the suspension as immaterial are not persuasive. For one, it asserts Lesiv's suspension was not materially adverse because he was suspended for only two days. But to reiterate, all unpaid suspensions—regardless of the length—could constitute adverse employment actions. *Benuzzi*, 647 F.3d at 665 ("[S]uspensions without pay … undoubtedly satisfy the materially adverse

meant for Lesiv to work as ordered. Second, and critically, after Lesiv refused the assignment, he was suspended, thus effectively trading one adverse action for another. Finally, even if we thought this situation resembled an "unfulfilled threat," *Poullard* cautioned that threats can sometimes qualify as materially adverse actions. See 829 F.3d at 856–57 & n.3. An unusually dangerous assignment that forces an employee to choose between insubordination and the danger could qualify as one of those exceptions. At least, we are not persuaded to hold as a matter of law that it could not.

[6] Unpaid suspensions also qualify as adverse actions in Title VII discrimination claims. E.g., *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 650 (7th Cir. 2011) (three-day suspension could qualify as adverse employment action for discrimination claim); *Russell v. Board of Trustees of the University of Illinois at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (same for five-day suspension).

standard."). Two days is not too short to qualify as a matter of law. See *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1113, 1121 (7th Cir. 2009) (three-day unpaid suspension could support retaliation claim); *Lloyd v. Swifty Transportation, Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) (same); see also *Appleton v. City of Gary, Indiana*, 781 F. App'x 501, 504 (7th Cir. 2019) ("Appleton's one-day suspension and her reduction in hours could constitute adverse employment actions.").

Illinois Central's argument also misses the key fact that courts evaluate suspensions for this purpose when they are imposed on the employees, not after later internal or union reviews are completed. Cf. *Nagle*, 554 F.3d at 1121 (rejecting argument that suspension was not materially adverse because it was later found to be improper: "[a]fter all, no one knew whether the suspension would be reversed or upheld" when first imposed and served). Here, Duggan told Lesiv "he was being removed from service." Lesiv reasonably understood at the time that his suspension was without pay and for an indefinite period. A jury could easily find that such a suspension would dissuade a reasonable employee from engaging in protected activity even if it ultimately did not last very long.

Second, Illinois Central argues the suspension was not materially adverse because, after Lesiv was reinstated, he was quickly paid for the time he missed. But an employer cannot make an unpaid suspension "paid" after the fact to avoid liability under Title VII as a matter of law. *Burlington Northern*, 548 U.S. at 73 ("[A]n indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay."); *Nagle*, 554 F.3d at 1121 (explaining that "reimbursement of lost pay" after an unpaid suspension "is not sufficient to defeat [a plaintiff's] Title VII retaliation

claim"); cf. *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) ("[W]e decline to endorse a rule that would allow employers to escape liability by merely reinstating the aggrieved employee months after termination, whenever it becomes clear that the employee intends to pursue her claims in court."), abrogated on other grounds by *Ortiz*, 834 F.3d 764–65.

Again, we will not speculate that Lesiv's paycheck was not affected, especially since Illinois Central has not made the case itself. In fact, Illinois Central argued in the district court that a delay in pay does not constitute an adverse employment action. That argument presupposed that his pay was indeed delayed. As explained, an employer cannot avoid summary judgment by paying the employee retroactively for the suspension. And as for the precise timing of the backpay, as to which our record is silent, a party opposing a motion for summary judgment needs to respond only to arguments the moving party actually made, not others that the moving party might have made but did not. See, e.g., *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("The nonmovant is not required to present evidence on an issue not raised by the movant."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) ("The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment."). If Illinois Central thought the timing of the backpay was material to its motion for summary judgment, it had a responsibility to offer specific

evidence about the timing and how it might have affected Lesiv's paycheck.[7]

To summarize, for purposes of summary judgment, Lesiv's solo RIP track assignment and suspension satisfy the materially adverse action requirement. Whether a reasonable employee would find these actions to be materially adverse in this context such that the employee would be dissuaded from engaging in the protected activity is at least a question for the trier of fact.

B. *Causation*

We turn now to the causation element of the individual retaliation claim. Here, we eliminate the assumption that Illinois Central acted with a retaliatory motive and consider whether Lesiv has presented enough evidence to survive summary judgment on this issue. He has not. To meet his burden on causation, Lesiv needed to offer evidence that a retaliatory motive was a "but-for cause of the challenged employment action." *Gracia v. SigmaTron International, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016), quoting *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013). "This requires proof that the unlawful retaliation would not have

---

[7] Illinois Central relies on *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772 (7th Cir. 2007), to argue that Lesiv's suspension was not materially adverse. That case is easily distinguishable. In *Nichols*, after a violent encounter with a civilian, the employer placed the plaintiff police officer on paid administrative leave pending a fitness-for-duty examination. We held that the action was not materially adverse as a matter of law. *Id.* at 786–87. Such paid administrative leaves for police investigations are routine after many types of incidents. They are not comparable to a disciplinary suspension of uncertain duration without pay.

occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.

Lesiv has not met his burden on causation for one simple reason: none of the relevant supervisors knew that Lesiv had engaged in protected activity by testifying in his brother's lawsuit. Knowledge of the protected activity is necessary to show causation for a retaliation claim. E.g., *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021) (affirming summary judgment for employer; for a retaliation claim to reach the jury, "the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity," and it is "not sufficient that a decision-maker could have or even should have known about the employee's complaint"). A supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place. Accord, *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668–69 (7th Cir. 2006).

Lesiv correctly conceded at oral argument and in the district court that the record does not indicate that Grayer or Duggan knew that Lesiv had testified in a deposition as part of his brother's lawsuit three months before the materially adverse actions took place. That concession resolves the issue. E.g., *Hamer v. Neighborhood Housing Services of Chicago*, 897 F.3d 835, 841 (7th Cir. 2018) (affirming summary judgment for employer because plaintiff did "not establish[] a genuine dispute about the decisionmakers' knowledge"); *Nagle*, 554 F.3d at 1121–22 (affirming grant of summary judgment for employer; plaintiff failed to offer evidence decision-maker had knowledge of his protected activity, which "doom[ed] his claim"). Lesiv cannot meet his burden on causation to survive

summary judgment because he cannot offer evidence of knowledge on the part of his supervisors. So while we disagree with the district court on the issue of a materially adverse action, in the end the district court correctly granted summary judgment in favor of Illinois Central on this claim.

III. *Third-Party Retaliation*

We now address Lesiv's third-party retaliation claim. On this issue, he asserts that Illinois Central retaliated against his brother Lyubomir by subjecting Lesiv to materially adverse actions, and that he can sue for that retaliation under *Thompson*, 562 U.S. 170. As an initial matter, the district court declined to address Lesiv's third-party claim because Lesiv was "not a third party" and had an individual retaliation claim related to his own protected activity. Thus, in the court's view, Lesiv could not advance a third-party claim here.

The court did not cite any support for treating individual and third-party claims as mutually exclusive. Neither does Illinois Central in repeating this position on appeal. We find no support for this position and decline to adopt it. We instead view the two claims as distinct but not mutually exclusive theories of retaliation. Cf. *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561 (3d Cir. 2002) (addressing different theories of individual and third-party retaliation under Americans with Disabilities Act, among others, as distinct theories of retaliation); see also *George v. Republic Airways Inc.*, No. 1:20-cv-01702-SEB-DLP, 2021 WL 1022428, at *3–6 (S.D. Ind. Mar. 17, 2021) (considering plaintiff's individual and third-party claims under Title VII as different theories of retaliation). There is no legal barrier to Lesiv bringing both individual and third-party retaliation claims.

We next consider whether Lesiv falls within Title VII's zone of interests to bring a third-party retaliation claim related to Lyubomir's protected activities. In its brief, Illinois Central makes an additional threshold argument that Lesiv does not meet those standards because he has not shown that Illinois Central harmed a third party to retaliate against Lesiv. But that argument inverts the standard for these types of claims.

A. *The Thompson Standard*

We draw our understanding of third-party retaliation claims from *Thompson*, 562 U.S. 170. In that case, plaintiff Thompson and his fiancée both worked at the defendant company. His fiancée filed a charge of sex discrimination with the Equal Employment Opportunity Commission. Three weeks later, the company fired not her but Thompson. He then sued the company, alleging that it fired him to retaliate against his fiancée.

To determine whether Thompson could bring a third-party retaliation claim despite not having engaged in protected activity himself, the Court first asked whether the fiancée could have sued for that retaliation. That question required determining whether the employer's firing of Thompson constituted unlawful retaliation. The Court concluded with little difficulty that if Thompson's version of the facts was true, then the firing violated Title VII. The Court thought it was "obvious" that, under the *Burlington Northern* standard, "a reasonable worker might be dissuaded from engaging in protected activity if she knew that her [fiancé] would be fired." 562 U.S. at 174. Thus, the fiancée could have sued for the company's action against Thompson as an unlawful act of retaliation against her.

The Court then turned to the "more difficult question" whether Thompson himself could also sue for that retaliation even though, again, he did not engage in any protected activity. 562 U.S. at 175. The Court said yes. Thompson qualified as a "person aggrieved" under Title VII. See 42 U.S.C. § 2000e–5(f)(1). He fell within the Act's "zone of interests," so he had a claim for retaliation. 562 U.S. at 175–78. As the Court explained, "the purpose of Title VII is to protect employees from their employers' unlawful actions," and the statute enables "suit by any plaintiff with an interest 'arguably [sought] to be protected by the statute.'" *Id.* at 178 (alteration in original), quoting *National Credit Union Admin. v. First National Bank & Trust Co.*, 522 U.S. 479, 495 (1998). Thompson was an employee, thereby falling under Title VII's general scope. Equally important, Thompson was "not an accidental victim of the retaliation;" rather, "injuring him was the employer's intended means of harming [his fiancée]." *Id.* Accordingly, the Court held that Thompson fell within the Act's zone of interests and was therefore "a person aggrieved with standing to sue" under the statute. *Id.*

B. *The "Zone of Interests" Test*

The next question is whether Lesiv falls within Title VII's zone of interests. Lesiv does if Lyubomir, Lesiv's brother, could have sued for the alleged retaliation here. If so, we ask whether Lesiv could also sue because harming Lesiv, an employee, was the employer's intended means of retaliating against Lyubomir. Since we conclude that Lesiv has no evidence to support this second element, we decline to address whether Lyubomir could have brought a retaliation suit himself.

C. *Causation*

On this record, a reasonable jury could not conclude that Illinois Central acted to retaliate against Lyubomir by harming Lesiv.[8] Like other circuits, we read this inquiry as a causation requirement. See, e.g., *Threat v. City of Cleveland*, 6 F.4th 672, 680–81 (6th Cir. 2021); *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1293–94 (11th Cir. 2021). We thus draw on our case law regarding causation for individual claims under Title VII.

Here, Lesiv must offer evidence that his brother's charge or lawsuit was "a but-for cause of the alleged adverse action by the employer." *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014), quoting *Nassar*, 570 U.S. at 362. "The requirement of but-for causation in retaliation claims

---

[8] This issue, like many related to "statutory standing," is a merits question. See, e.g., *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) (explaining that to fall under Lanham Act's zone of interests, "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations"); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 & n.2 (1998) (in zone-of-interests tests, "the merits inquiry and the statutory standing inquiry often 'overlap,'" and in some cases, "it would be exceedingly artificial to draw a distinction between the two" (internal citation omitted)). If a reasonable jury could conclude that Illinois Central took action against Lesiv to harm his brother, Lesiv would fall within Title VII's zone of interests and would therefore have a valid claim for that retaliation. Since a reasonable jury could not come to that conclusion, Lesiv's claim fails on the merits, not for lack of jurisdiction. See *Lexmark*, 572 U.S. at 128 n.4 (clarifying that "statutory standing" is "misleading, since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case" (internal quotation marks and citations omitted)).

does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Id.* This showing can be made with circumstantial evidence. See *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). Regardless of the types of evidence Lesiv puts forward, we follow the *Ortiz* directive to analyze all the evidence and ask whether the evidence would permit a reasonable jury to find that Lyubomir's charge or lawsuit caused Lesiv to suffer the adverse employment actions. See 834 F.3d at 765.[9]

As discussed above, Lesiv offered evidence of two materially adverse actions: the dangerous work assignment and the suspension. To meet his burden on causation and survive summary judgment, he must offer evidence of a retaliatory motive on the part of Grayer, who imposed the work assignment, and/or Duggan, who imposed the suspension. Lesiv relies on two pieces of circumstantial evidence to support those inferences of causation: the different treatment he received compared to a similarly situated employee and the timing of the incidents. We address each in turn, beginning with Duggan and the suspension.

---

[9] Unlike the evidence on Lesiv's individual retaliation claim based on his own protected activity, there is evidence that some of the relevant supervisors knew of the brother's protected activity. Duggan, for instance, was named as a witness in the brother's lawsuit and was in the process of scheduling his deposition around the time of Lesiv's dangerous assignment and suspension. Lesiv also argues that Grayer was aware of the lawsuit because his name was in his brother's complaint and he was a potential witness. As we explain in the text, however, Lesiv's evidence cannot meet the causation standard even if everyone involved was aware of his brother's protected activity.

1.  *Evidence of Duggan's Motive*

Turning to the comparator first, recall that another employee, Barwan, refused to work the "A yard" the day before Lesiv refused to work the RIP track. (Both of those assignments entail heavy repairs on railcars.) Barwan, however, was not suspended for his insubordination. Lesiv contends this disparity in treatment supports a reasonable inference of a retaliatory motive on the part of Duggan. We disagree.

Evidence that a "similarly situated employee[]" whose close contact did not engage in protected conduct was "treated differently may furnish circumstantial evidence of retaliation or other unlawful motive." *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018). Whether a comparator is similarly situated is often a question for the jury. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th Cir. 2018). We ask whether the two employees are situated similarly enough for a reasonable comparison. *Id.*, citing *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012). In a case challenging disciplinary action, the plaintiff and comparator ordinarily must have "dealt with the same supervisor, [been] subject to the same standards, and ha[ve] engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Donley*, 906 F.3d at 639 (alterations in original). The congruence need not be perfect. *Id.*

Some similarities between Lesiv and Barwan are easy to see. The two engaged in similar conduct: Both refused a work assignment and both dealt with the same supervisor: Duggan. And the supervisor, as the decision-maker, treated the two differently: Duggan suspended Lesiv but not Barwan. Lesiv thus asserts that the divergent treatment between the two

would support a reasonable inference of a retaliatory motive on the part of Duggan.[10]

To justify the different treatment of Lesiv and Barwan, Illinois Central argues first that the two engaged in different conduct. One of its arguments is persuasive while the other is not. To start, Illinois Central effectively contends that "this was Barwan being Barwan," whereas Lesiv's reaction was out of the ordinary for him and hostile, so that the relief supervisor and presumably Duggan correctly viewed their behaviors differently. That argument might be offered at trial, but "it is not a winner on summary judgment." *Coleman*, 667 F.3d at 851. Courts are not in the business of distinguishing comparators in discipline cases by deciding on summary judgment whether one person was joking around and the other was not. "[A]t the summary judgment stage, the employer cannot defeat a plaintiff's prima facie case of discrimination on the theory that it applied its 'no tolerance' policy on threats to some workers while dismissing dangerous acts of others as mere 'horseplay.'" *Id.* We reiterate: "Such fact issues are the province of the jury." *Id.*

---

[10] At oral argument, Illinois Central disputed whether Lesiv and Barwan had the same decision-maker. It argued that the relief supervisor interacted with Barwan in the moment, whereas Duggan communicated with Lesiv, so the two were subject to different supervisors. The distinction is not persuasive, at least as a matter of law on summary judgment. Both employees told the relief supervisor they were refusing to work their assignments. Duggan was made aware of Lesiv's refusal immediately and learned of Barwan's later. Duggan decided to suspend Lesiv but not Barwan. The different treatment occurred when Duggan learned of Barwan's actions and did not impose a similar penalty. For purposes of summary judgment, we treat Lesiv and Barwan as subject to the same decision-maker.

Illinois Central's second argument is a winner, however, and defeats the comparator here. It is true that Barwan and Lesiv both refused a work assignment, but Lesiv's actions went further. The stated reasons for Lesiv's suspension were because of his attitude toward the relief supervisor in refusing the RIP track assignment *and* his tone with Duggan during their phone conversation. Barwan was not insubordinate toward Duggan. Even viewing the facts most reasonably favorable to Lesiv, the altercation is a differentiating circumstance that distinguishes Barwan and Lesiv and Duggan's treatment of them. *Donley*, 906 F.3d at 639. Thus, Lesiv's comparator evidence could not support a finding that Duggan acted with a retaliatory motive.

If we had any doubts on that score, they are assuaged by the other undisputed evidence in the record, which weighs decisively against Lesiv here. Take, for instance, the timing of the suspension. Duggan suspended Lesiv two and a half years after Lyubomir filed a charge of discrimination and retaliation and nearly a year after Lyubomir filed his lawsuit in state court. While suspicious timing can support an inference of a retaliatory motive, such a long gap between the protected activity and adverse action "can weaken and eventually break an inference of causation." *Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017); see also *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy."). A two-and-a-half-year gap and near one-year gap between the respective protected activities and materially adverse actions strongly suggest that the timing was not suspicious and cast serious doubts on whether a jury could find a retaliatory motive here. See *id.* (one-and-a-half-

year gap was "well beyond the time that would allow a reasonable jury to conclude that [the materially adverse action] was causally related to [the protected activity]").

Lesiv points out correctly that a plaintiff can sometimes establish causation despite a substantial delay between the protected activity and the adverse action. See *Baines*, 863 F.3d at 665 ("[A] long gap will [not] undermine a causal connection that is otherwise supported by sufficient circumstantial evidence."). In such cases, we typically see evidence of prolonged antagonism against the plaintiff, evidence that, despite a long gap, the alleged retaliation was the first opportunity for retaliation, or something similar. See *Carlson*, 758 F.3d at 829 (reversing dismissal; despite long gap between adverse actions and protected activity, evidence of constant antagonism supported inference of retaliatory motive); *Malin v. Hospira, Inc.*, 762 F.3d 552, 559–60 (7th Cir. 2014) (reversing summary judgment; long gap was not fatal to retaliation claim when evidence indicated defendant "had a long memory," repeatedly retaliated against plaintiff by denying her promotions, and then effectively demoted her when first given the opportunity). Lesiv has not produced comparable evidence to support a jury verdict here.[11]

---

[11] Lesiv points to affidavits from co-workers saying that management monitored him more closely and targeted him after the brother filed his lawsuit. Plaintiffs are, of course, entitled to submit affidavits that contain information based on witnesses' personal knowledge and experiences. See *Hill v. Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013). These affidavits, however, are conclusory and do not offer evidence to support their conclusions, and some are not related to Lesiv's or his brother's protected activities: "I believe Illinois Central placed a target upon the entire Lesiv family due to the disciplinary issues related to Lyubomir," and "I believe Illinois Central placed a 'bullseye' on [Lesiv's] … back as retaliation for

Nonetheless, Lesiv asserts that the timing is suspicious and supports an inference of retaliation because Lyubomir's state lawsuit was still pending. In addition, Duggan had been contacted about scheduling a deposition in that lawsuit roughly two weeks before the adverse action against Lesiv. Lesiv contends that Lyubomir's lawsuit might have been on Duggan's mind when he suspended Lesiv, supporting an inference of retaliatory motive. In the absence of other evidence supporting the inference, this is too speculative. See, e.g., *Igasaki*, 988 F.3d at 960 (affirming summary judgment on retaliation claim and rejecting arguments based on layers of "impermissible speculation"). Even viewing the evidence in the light reasonably most favorable to Lesiv, the adverse actions here came immediately after heated confrontations between Lesiv and his supervisors, providing a ready explanation that had nothing to do with his brother's lawsuit.

At bottom, there simply is no evidence that Duggan was responding to his brother's protected activity by suspending Lesiv. The record does not contain sufficient evidence to permit a reasonable fact finder to conclude that a retaliatory motive caused the materially adverse action here, even on summary judgment.

---

Lesiv's refusal to work the RIP track alone." They do not include factual details of Duggan's motivations or actions toward Lesiv leading up to the suspension to support those beliefs and that would lend support to an inference of retaliation. These affidavits thus do not present a genuine issue of material fact precluding summary judgment. Accord, *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc) ("Discrimination law would be unmanageable if disgruntled employees—the friends of the plaintiff and often people in the same legal position as the plaintiff—could defeat summary judgment by affidavits speculating about the defendant's motives.").

2.  *Evidence of Grayer's Motive*

Finally, we turn to Grayer and the solo RIP track assignment. Lesiv's evidence would not support a reasonable inference that a desire to retaliate against Lyubomir drove Grayer to assign Lesiv to work the RIP track alone. All a jury would have to support a finding of causation is the two-and-a-half-year gap between Lyubomir's charge of discrimination and Lesiv's solo RIP track assignment, and the nearly one-year gap between the lawsuit and the assignment. That evidence is not enough to pose a genuine dispute of fact and defeat summary judgment on causation. Accord, *Igasaki*, 988 F.3d at 959 (without more, evidence of two-month gap between protected activities and adverse action did not defeat summary judgment on retaliation claim).

To sum up, Lesiv has not met his burden on causation to support the reasonable inference that he faced materially adverse actions because of his or his brother's activities protected by Title VII. Illinois Central was entitled to summary judgment on both claims.

AFFIRMED.