In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1271
BRIAN XIONG,
 Plaintiff-Appellant,
 v.

BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Western District of Wisconsin.
 No. 3:20-cv-242 — William M. Conley, Judge.
 ____________________

 ARGUED JANUARY 10, 2023 — DECIDED MARCH 9, 2023
 ____________________

 Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, Circuit
Judges.
 SCUDDER, Circuit Judge. After butting heads with his boss
for months, Brian Xiong demanded change: he wanted a new
supervisor or he would stop working. The University of Wis-
consin Oshkosh responded by firing him. If that was all,
Xiong’s lawsuit would be rightfully dismissed at summary
judgment. But alongside leveling his demand, Xiong also re-
ported to the University that his boss and the human
2 No. 22-1271

resources department were violating Title VII in their hiring
and promotion practices. Because the University chose to fire
him just one day after this whistleblowing, a reasonable jury
could infer that his termination was retaliatory. Employers of-
ten have mixed motives for taking adverse actions against em-
ployees, and the existence of both prohibited and permissible
justifications reserves the question for a jury to resolve. Xiong
may win at trial, or he may lose. Our conclusion is limited to
saying he has shown enough to permit a jury to find that his
termination would not have happened absent his complaint
about Title VII violations. We therefore aﬃrm in part and re-
verse in part.
 I

 A

 Xiong is Hmong and speaks English as a second language.
He joined the University of Wisconsin Oshkosh as its Director
of Affirmative Action in October 2018. This position entailed
ensuring that the campus complied with the University’s af-
firmative action plan and developing policies consistent with
that plan. Xiong reported to Shawna Kuether, Associate Vice
Chancellor of Human Resources, but the relationship be-
tween them soon soured.
 In December 2018, for example, and in response to an ac-
count of race discrimination, Xiong drafted an investigation
report that Kuether found to be of poor quality. Two months
later, in February 2019, Xiong gave Kuether a 175-page self-
assessment as part of his annual performance review in which
he claimed he was being paid less because he is Hmong and
Asian. Kuether then canceled his review meeting, declined to
reschedule it despite Xiong’s follow-up efforts, and did not
No. 22-1271 3

share the final written performance review with him until the
University fired him. Experiences like these led to Xiong’s im-
pression that Kuether specifically and the HR department
more generally supported neither him nor the University’s
broader diversity goals.
 The tension between Xiong and Kuether came to a head in
February and March 2019, when Xiong attempted to hire a
new training and compliance officer to work under him. The
search committee interviewed two white women and one La-
tina woman, Natasha Aguilera. Xiong, who had final say on
who to hire, selected Aguilera because she had a law degree
and would add diversity to the HR department, which was
primarily white.
 But Kuether questioned Xiong’s judgment. On March 1,
she emailed him to slow the hiring process because she had
heard concerns about Aguilera from others who had inter-
viewed her. This prompted an in-person meeting on March 4
between Xiong and Kuether, the recollections of which con-
tradict each other. Xiong recalls Kuether saying “people of
color are not a good fit” for human resources. Kuether denies
ever saying anything like that.
 A flurry of emails followed this meeting. Kuether first re-
quested that Xiong schedule follow-up interviews with the
candidates for the new training and compliance position.
Xiong responded by copying James Fletcher, the Vice Chan-
cellor of Finance and Administration and Kuether’s boss, and
insinuating that race was the motivating factor for Kuether
questioning Xiong’s selection of Aguilera. In a separate email
to Fletcher the next day, Xiong demanded that he no longer
report to Kuether.
4 No. 22-1271

 On March 6, Xiong and Fletcher met to discuss the hiring
situation and Xiong’s demand for a change in reporting struc-
ture. Xiong shared what Kuether had allegedly said about
people of color not being a good fit in HR, though Fletcher
denies ever hearing about that specific comment. Xiong says
he also raised broader concerns about the HR department’s
hiring and promotion policies, expressing the view that the
University could face legal liability. In response to all this,
Fletcher recalls saying that he hoped that Xiong and Kuether
could work out their problems.
 The next day, March 7, Fletcher met with three other Uni-
versity leaders, including the Chancellor and an attorney in
the general counsel’s office. Fletcher stated that he had de-
cided to fire Xiong, subject to a review of any positive infor-
mation in Kuether’s written performance review. After con-
firming he was not missing anything, Fletcher terminated
Xiong on March 12. He explained that he made the decision
due both to Xiong’s insubordination and his poor work per-
formance.
 Xiong sued the University a year later, alleging counts of
discrimination and retaliation under Title VII.
 B
 The district court entered summary judgment for the Uni-
versity on both of Xiong’s claims. The district court started
with Xiong’s Title VII discrimination claim and concluded
that he failed to establish a prima facie case under the McDon-
nell Douglas framework. See McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973). And so too, the district court continued,
did Xiong fail to point to evidence supporting his contention
that his Hmong ethnicity drove his termination. The district
No. 22-1271 5

court saw all of this as precluding a jury from finding prohib-
ited discrimination.
 Xiong’s retaliation claim fared no better. The district court
recognized that he had premised his claim on activity that Ti-
tle VII protects—his complaints about his own pay and
Kuether’s involvement in the hiring process of Aguilera—but
Xiong had not identified evidence connecting that activity to
the University’s decision to fire him.
 Xiong now appeals both rulings.
 II
 We review the grant of summary judgment to the Univer-
sity against a clean slate, drawing all reasonable inferences
from the record in favor of Xiong as the non-movant. See
Groves v. South Bend Cmty. Sch. Corp., 51 F.4th 766, 769 (7th Cir.
2022). We first address Xiong’s discrimination claim and then
his retaliation claim.
 A
 Although no longer required, Xiong invoked the McDon-
nell Douglas burden-shifting framework to prove his Title VII
discrimination claim. See Ortiz v. Werner Enters., Inc., 834 F.3d
760, 766 (7th Cir. 2016). Under this framework, once a plaintiff
sets forth an initial case of discrimination, the burden then
shifts to the defendant to identify a nondiscriminatory justifi-
cation for the adverse action. See Groves, 51 F.4th at 770. After
the defendant proffers that justification, the plaintiff must
prove that the nondiscriminatory reason was pretext for dis-
crimination. See id.
 The pretext inquiry is dispositive here because Xiong has
forfeited the contentions he presses on appeal. For his
6 No. 22-1271

discrimination claim to reach a jury, Xiong had to identify ev-
idence indicating that the statutorily protected factor—his
Hmong ethnicity—caused his termination, notwithstanding
the University’s explanation that he engaged in insubordina-
tion (by demanding a new supervisor) and failing to meet per-
formance expectations.
 Xiong’s arguments on appeal are night and day compared
to what he presented to the district court. In the court below,
Xiong made the all-too-common mistake of arguing that the
University’s nondiscriminatory reason was pretextual with-
out ever explaining why it was a pretext for discrimination
due to him being Hmong. See, e.g., Chatman v. Bd. of Educ., 5
F.4th 738, 747 (7th Cir. 2021) (discussing how the plaintiff
failed to demonstrate that “discriminatory animus” drove the
adverse employment action); Bass v. Joliet Pub. Sch. Dist.
No. 86, 746 F.3d 835, 840 (7th Cir. 2014) (explaining that the
plaintiff failed to present evidence addressing “the funda-
mental question” of “whether a reasonable jury could find
prohibited discrimination”). Put differently, Xiong asserted
that the University was lying but stopped short of taking the
added, necessary step of pointing to evidence that the pur-
ported lie masked a proscribed reason for him being fired. As
the district court rightfully concluded, that contention does
not suffice to reach a jury.
 In his appellate briefs, Xiong expands his pretext analysis
to encompass specific examples from which a jury might infer
that his Hmong ethnicity motivated his termination. By way
of example, he contends that in critiquing his work product,
Kuether penalized him for speaking English as a second lan-
guage and otherwise stereotyped him as an Asian. But that
contention should have been presented to the district court in
No. 22-1271 7

the first instance. Although we can accept a “new twist” on
an argument advanced in the district court, United States v.
Billups, 536 F.3d 574, 578 (7th Cir. 2008), a litigant cannot raise
entirely new arguments on appeal. See Flynn v. FCA US LLC,
39 F.4th 946, 953 (7th Cir. 2022) (“Our task is to review the
district court’s decision as the issue was presented by the liti-
gants.”).
 We agree with the University that Xiong has forfeited
these arguments. The district court properly entered sum-
mary judgment for the University on Xiong’s discrimination
claim.
 B
 That brings us to Xiong’s retaliation claim. To establish re-
taliation under Title VII, Xiong must show that he engaged in
a statutorily protected activity, he suffered a materially ad-
verse employment action, and there was a causal connection
between the two. See Lesiv v. Illinois Cent. R.R. Co., 39 F.4th
903, 911 (7th Cir. 2022). All agree that Xiong’s termination
qualifies as a materially adverse employment action.
 The strongest basis for Xiong’s retaliation claim stems
from what he reported to Fletcher on March 6. Recall the se-
quence of events preceding Xiong’s termination. On March 4,
Kuether allegedly told Xiong that “people of color are not a
good fit” when the two met to discuss hiring someone into the
new training and compliance officer position. Xiong then met
with Fletcher two days later after expressing concerns over
email about whether race prompted Kuether’s intervention. It
was at this March 6 meeting that Xiong shared what Kuether
had purportedly said, voiced his concerns about the HR de-
partment’s discriminatory hiring and promotion practices,
8 No. 22-1271

and reported that all of this could give rise to legal liability.
These comments amount to Xiong complaining about dis-
crimination on the basis of race. As the district court rightfully
concluded, the statements qualify as statutorily protected ac-
tivity. See Miller v. Chicago Transit Auth., 20 F.4th 1148, 1155
(7th Cir. 2021).
 Where we part ways with the district court is on the issue
of causation. Fletcher made the tentative decision to fire Xiong
on March 7, just one day after Xiong met with Fletcher and
voiced concerns about unlawful discrimination and Title VII
liability. This close temporal proximity alone can give rise to
a finding of causation. To be sure, we have “rejected any
bright-line rule about how close the events must be to estab-
lish causation.” Castro v. DeVry Univ., Inc., 786 F.3d 559, 565
(7th Cir. 2015). But here we have little trouble concluding that
a jury could infer causation when merely one day passes be-
tween the protected activity and the adverse employment ac-
tion. See Kidwell v. Eisenhauer, 679 F.3d 957, 966 (7th Cir. 2012)
(permitting an inference of causation on the sole basis of tem-
poral proximity when the timing is “no more than a few days”
because “the closer two events are, the more likely that the
first caused the second”). Such a compact timeline suffices as
one of the instances where the timing is tight enough to sup-
port an inference of causation.
 It is also of no consequence, at least at summary judgment,
that Xiong reiterated his demands for a new supervisor to
Fletcher during the same March 6 meeting. Title VII demands
“but-for causation” between the protected activity and the re-
taliation. Lesiv, 39 F.4th at 918. But that standard, as case law
explains, “does not mean that the protected activity must
have been the only cause of the adverse action. Rather, it
No. 22-1271 9

means that the adverse action would not have happened with-
out the activity.” Id. (emphasis added) (quoting Carlson v. CSX
Trans., Inc., 758 F.3d 819, 828 n.1 (7th Cir. 2014)). If an adverse
employment action is the result of two different causes—one
prohibited by Title VII and the other permissible—then sum-
mary judgment should not be granted to an employer. See
Malin v. Hospira, Inc., 762 F.3d 552, 562 n.3 (7th Cir. 2014) (ex-
plaining that a “single event can have multiple but-for
causes”).
 That is the situation here, especially when viewing the rec-
ord in the light most favorable to Xiong as Rule 56 requires. A
jury could find that Fletcher decided to fire Xiong because of
insubordination and his complaints about Kuether’s com-
ments. It is up to the jury, not a court at summary judgment,
to unravel the competing, and perhaps intertwined, narra-
tives as to why Fletcher decided to take that action. See Castro,
786 F.3d at 569 (“Employers cannot retaliate against employ-
ees who complain about violations of Title VII under the ruse
that the employee was being ‘disloyal’ or ‘insubordinate’ by
opposing the unlawful activity.”).
 The facts before us also do not present a situation where
the nondiscriminatory reason so overwhelms that no reason-
able jury could infer the protected activity was the but-for
cause. See Malin, 762 F.3d at 562 n.3 (specifying that a jury
must be able to conclude that both but-for causes have merit
to avoid summary judgment). Viewing the evidence in the
light most favorable to Xiong, his purported insubordination
does not cross that line. The demand to change his reporting
structure, though perhaps ill-advised and reflecting insubor-
dination, is a common request for a disgruntled employee. To
the extent that this ultimatum may have drove Fletcher’s
10 No. 22-1271

termination decision, Xiong has raised a genuine dispute of
material fact on the issue such that a jury should decide cau-
sation in the first instance. Whether he is able to prevail at
trial, however, is an altogether different question—one we
leave to a jury to resolve.
 C
 We conclude by constraining the scope of this claim on re-
mand. Beyond the protected activity of complaining about
race discrimination in connection with the HR department,
Xiong has also identified his own pay disparity complaint as
an alternative theory underpinning his retaliation claim. This
theory of liability is not viable on the summary judgment rec-
ord before us.
 Xiong raised his pay disparity complaint only with
Kuether, not Fletcher, and we see no evidence that Fletcher
was even aware of this complaint on March 7 when he met
with fellow University leaders and made the decision to fire
Xiong subject to checking Kuether’s written performance
evaluation. See Lesiv, 39 F.4th at 915 (“Knowledge of the pro-
tected activity is necessary to show causation for a retaliation
claim.”). Nor could a reasonable jury infer that Fletcher’s sub-
sequent meeting with Kuether provides the basis for causa-
tion because the University had already reached its decision
to fire Xiong beforehand. As Xiong admits, Fletcher only con-
ferred with Kuether and checked Xiong’s performance review
to see if there was any positive information he was missing.
There was not, so Fletcher held firm to his termination deci-
sion from a few days earlier.
 What all of this means is that future litigation on the retal-
iation claim should focus on what motivated Fletcher, as the
No. 22-1271 11

ultimate decision maker for the adverse action, to make the
contingent decision to terminate Xiong on March 7.
 III
 For these reasons, we AFFIRM in part, REVERSE in part,
and REMAND for proceedings consistent with this opinion.
12 No. 22-1271

 KIRSCH, Circuit Judge, dissenting in part. I agree with the
majority’s resolution of the discrimination claim. I disagree,
however, with its treatment of the retaliation claim. A reason-
able jury could not find that the timing of Xiong’s termination
was suspicious. In my view, the district court properly
granted summary judgment to the University, and I would
aﬃrm in full.
 The majority rests its entire retaliation analysis on tem-
poral proximity. It concludes that Xiong established a prima
facie case of retaliation because he complained that his super-
visor, Shawna Kuether, made a racist comment the day before
the University tentatively decided to fire him. But the major-
ity conflates temporal proximity with suspicious timing. That
diﬀerence has legal significance. While a plaintiﬀ may survive
summary judgment by oﬀering evidence of suspicious tim-
ing, temporal proximity alone is insuﬃcient without evidence
that makes it suspicious. Even when we can conclude that the
timing of the adverse action is suspicious, we have repeatedly
cautioned that “suspicious timing will rarely be suﬃcient in
and of itself to create a triable issue” because “suspicious tim-
ing may be just that—suspicious—and a suspicion is not
enough to get past a motion for summary judgment.” Kidwell
v. Eisenhauer, 679 F.3d 957, 966 (7th Cir. 2012).
 Xiong was hired in the fall of 2018. From the start, he and
Kuether had a poor relationship. He complained that Kuether
was unqualified, and he consistently resisted working with
her. He insisted that his position be restructured and repeat-
edly mentioned this to James Fletcher (Kuether’s boss). Each
time, Fletcher rejected the proposal.
No. 22-1271 13

 On March 4, 2019, Xiong met with Fletcher and explained
that he would no longer report to Kuether. Xiong sent Fletcher
a follow-up e-mail with the following demand:
 Dear James – I’m done reporting to Shawna. She
 wants to control but lack of of [sic] leadership,
 no knowledge of aﬃrmative action/equity, and
 she is feeling insecure. … I either report to you
 or to the Chancellor, other option is to Dr. Sylvia
 Carey-Butler.
 On March 6, Xiong met with Fletcher once more and reis-
sued his ultimatum. Undisputed Material Facts, R. 41 ¶ 106
(“Xiong issued Fletcher the ultimatum that he would not con-
tinue working unless he received a new supervisor[.]”). Xiong
also reported concerns of Title VII violations in the depart-
ment’s hiring practices and relayed Kuether’s comment that
people of color were “not a good fit” for human resources. At
this point, Xiong fully intended to resign unless the Univer-
sity changed his reporting structure.
 The next day, an attorney in the University’s general coun-
sel’s oﬃce convened a meeting with Fletcher, the University
of Wisconsin-Oshkosh Chancellor, and a Vice Chancellor. The
purpose of this meeting was to discuss ongoing concerns with
Xiong’s job performance: his unrelenting complaints about
the reporting structure, poor quality of his investigative re-
port, lack of focus, and failure to meaningfully participate in
a class that was specifically oﬀered to help Xiong improve his
skills in investigating and writing reports. For these reasons,
the group conditionally decided to terminate Xiong’s employ-
ment pending a review of his performance evaluation and a
discussion with Kuether.
14 No. 22-1271

 Missing from all of this is any evidence that the timing of
Xiong’s termination was suspicious, which is why the major-
ity does not say it was. The University decided to fire Xiong
two days after he issued his final ultimatum. That is a reason-
able explanation disconnected from Xiong’s complaint of race
discrimination. Xiong had been struggling at his job and, ra-
ther than accede to his demand for a diﬀerent supervisor, the
University decided it was best to part ways. Though the ma-
jority makes light of the ultimatum, reasoning that it is a com-
mon request of unsatisfied employees, no reasonable jury
could agree with that view given the record as a whole.
 If all the record showed were a complaint of race discrim-
ination and a firing the next day, perhaps a reasonable jury
could find that temporal proximity to be suspicious. But at
summary judgment, we cannot ignore undisputed material
facts. Xiong’s ultimatum and his history of insubordination
were indisputably central to the University’s decision to ter-
minate him. Here, those facts make it such that no reasonable
jury could view the timing between Xiong’s complaint and his
tentative termination as suspicious. I respectfully dissent.