In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-1470

WENDY LOHMEIER,

*Plaintiff-Appellant,*

*v.*

GOTTLIEB MEMORIAL HOSPITAL, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-08136 — **Steven C. Seeger**, *Judge.*

———————————

ARGUED OCTOBER 29, 2024 — DECIDED AUGUST 14, 2025

———————————

Before EASTERBROOK, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* On October 12, 2018, controlled opioids went missing from Gottlieb Memorial Hospital's intensive care unit. In the hours that followed, hospital staff reported that Wendy Lohmeier, a registered nurse working in that unit, looked out of sorts. Lohmeier's supervisors asked her to submit to a fitness for duty exam and drug test.

After further investigation, the Hospital terminated Lohmeier for suspected narcotics theft and behavior concerns.

Lohmeier maintains that the investigation and termination were motivated by discriminatory and retaliatory animus against her as a disabled, dark-skinned Salvadoran woman. She sued Gottlieb Memorial Hospital and Loyola University Medical Center (together, the Hospital) for retaliation and discrimination on the basis of color and national origin; disability discrimination; Family Medical Leave Act interference and retaliation; and violation of the Illinois Human Rights Act. The district court granted summary judgment to the Hospital on all claims. Because a reasonable factfinder could not find on this record that the Hospital violated the law, we affirm.

**I**

This appeal arises from a summary judgment award, so we present the facts in the light most favorable to Lohmeier as the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Wendy Lohmeier is a registered nurse and a self-described dark-skinned Salvadoran woman. Gottlieb Hospital, an acute care facility part of the Loyola University Medical Center, hired Lohmeier in February 2018. On the night of October 11, 2018, Lohmeier experienced a shingles flare-up and took a four-to-six-hour dose of Norco, an opioid prescribed to her to treat the condition. The next morning, she went to work. Because Lohmeier believed the drug would not affect her performance at work, she did not alert her supervisor to her Norco use.

### A. Drug and Alcohol Use Policy

The Hospital's drug and alcohol use policy prohibited the use of non-prescription drugs. It also imposed a reporting requirement for the use of prescribed drugs that could affect job performance or safety. The policy also required employees to immediately report suspected policy violations, which could be indicated by an employee exhibiting slurred speech, lack of coordination, mood swings, or aggressive behavior. Supervisors were required to immediately investigate any possible violation, including by speaking to the suspected employee and ordering a fitness for duty exam, if the supervisor determined one was needed. The policy instructed that an employee suspected of being unfit for duty be released to a family member or sent home in a cab.

### B. Events of October 12

During the afternoon of October 12, morphine and fentanyl (both opioids) were improperly taken from the Hospital's Pyxis machine, which securely dispenses prescribed medication. We detail the specifics of both incidents below but first explain how the Pyxis machine works. To access the machine, a nurse must first swipe her keycard to enter the equipment room, where the machine is kept. The Pyxis itself then requires the nurse's username and fingerprint. Once unlocked, the nurse can select any medication prescribed for any listed patient and the Pyxis will dispense it. If a nurse does not affirmatively log out of the machine, the session remains active for two minutes. During that window, anyone inside the room can select additional medication to be dispensed.

Around 3:20 p.m., insulin and morphine were taken under the log-in credentials of Caroline Wolak, a nurse on duty in

the ICU. Wolak testified that she took out the insulin and only discovered that morphine had been taken under her name three hours later when she logged back onto the Pyxis machine. She then went to the nurses' station and asked if anyone had taken the morphine. At this time, Wolak stated, she observed that Lohmeier was unusually slow to respond, avoided eye contact, struggled to keep her eyes open, and slurred her speech.

Wolak reported to the lead nurse, Megan Daniels, that the morphine had disappeared. Daniels began investigating—she walked through the ICU asking the other nurses if they had taken the missing morphine. Each nurse denied taking the medication. Daniels testified that Wolak and another nurse, Weronika Brzezinska, told her Lohmeier did not look well, and Wolak suggested she check on Lohmeier. When Daniels tried to check in, Lohmeier responded by "look[ing] up at [her] with her eyes half opened [and] just kind of made a [groaning] noise at [her]." Daniels added that "[Lohmeier] did not appear like the person that I know or I knew" and she thought Lohmeier appeared intoxicated. Still, Lohmeier denied taking the morphine. Daniels then contacted the nursing supervisor, Alana Saccameno.

At about 7:00 p.m., roughly an hour after Wolak reported morphine was missing, an ICU nurse on the next shift, James Irving, spoke with Lohmeier about one of her patients as part of the shift handover. Irving recalled that Lohmeier frequently paused and appeared lost in thought.

Shortly after 7:00 p.m., morphine and fentanyl were taken from the Pyxis under the log-in credentials of another nurse on duty, Russel Zalas. Zalas explained he only took out the

morphine and did not discover that fentanyl had been taken out until later. We will return shortly to this missing fentanyl.

But first, after meeting to discuss Wolak's discovery of the missing morphine, Saccameno and Daniels approached Lohmeier to ask her to submit to a fitness for duty exam. Lohmeier testified that she was humiliated because other nurses could hear Saccameno and Daniels asking her to take the exam. Saccameno testified that during the conversation, Lohmeier's responses appeared very slow and deliberate, her speech was slurred, her eyes were heavy, and she appeared drowsy. Saccameno believed Lohmeier was impaired. According to Daniels, Lohmeier appeared "intoxicated to the point where she did not care" and did not seem to understand what was going on. Lohmeier agreed to the exam, and Saccameno escorted her to the emergency room. Saccameno and Daniels did not ask any other employees to submit to a fitness for duty exam.

In the emergency room, nurse Martha Amas initially evaluated Lohmeier. Amas reported in an email sent the next morning: "[Lohmeier] appeared intoxicated with slurred speech, slow reaction time, bloodshot eyes, droopy eyelids, and a misstep in her gait. While she did not smell of alcohol, [Lohmeier] did appear intoxicated." Dr. Julieanne Ball, the emergency room attending physician, next evaluated Lohmeier. Dr. Ball reported that Lohmeier had a slow response, her eyes were "glazed and sluggish," but her gait was steady. After ordering a drug and alcohol screen, Dr. Ball asked Lohmeier if someone could pick her up from the Hospital. Lohmeier responded that she did not want someone to get her. Once the alcohol test returned negative and noting that she appeared well enough to drive, Dr. Ball discharged

Lohmeier. Testifying later, Dr. Ball explained that Lohmeier "did seem to me, at least, to be possibly under the influence of drugs."

Lohmeier informed Saccameno that Dr. Ball discharged her. Although the drug and alcohol use policy instructed that an employee unfit for duty should be released to a family member or sent home in a cab, Saccameno instructed Lohmeier to complete her charting tasks while Saccameno investigated another incident.

As previewed earlier, at about 8:00 p.m., ICU nurse Zalas noticed that fentanyl had been taken using his credentials. He questioned the nurses on duty, and no one admitted to taking the drug. Zalas reported the missing medication to lead nurse Daniels. According to Zalas, Daniels said, "Let me ask you this: Is Wendy there?," which Zalas interpreted as Daniels suspecting Lohmeier had taken the fentanyl. Daniels again interviewed each nurse on duty, and again each denied taking the drug. Irving, the ICU nurse with whom Lohmeier had spoken during a shift change, told Daniels that he thought Lohmeier was "under the influence of something."

At some point during this fentanyl investigation, Lohmeier asked to go home because she was unable to complete her charts as directed. Before Lohmeier left the hospital, Saccameno informed her that she was suspended until further notice. Later that night, the drug test Dr. Ball ordered returned positive for opiates.

### C. Subsequent Investigation

The Hospital convened a group of managerial staff to investigate. Members of this six-person committee included Daniels, Noel Kirk, Ginger Hook, and Deborah Shrewsbury.

The committee focused on two issues: (1) whether Lohmeier was fit for duty on October 12, and (2) whether a drug diversion occurred. The group interviewed witnesses and pulled access reports from the Pyxis and the equipment room.

Daniels and Shrewsbury interviewed Wolak, Irving, and charge nurse Sharon Brace about the events of October 12. Wolak repeated that Lohmeier seemed impaired that day and had shoved a tube into a patient's nose roughly. Brace added that the patient's nose was bloody. Irving reiterated that Lohmeier "did not seem all there" and her behavior was alarming to him. In addition to these witness interviews, the committee received a written statement from Saccameno that Lohmeier "appeared to be very 'sleepy' with heavy eyes and answered in a very slow and deliberate way while slurring some of her speech." Kirk also spoke with the employee health department and learned that Lohmeier's drug test returned positive for opiates.

The Pyxis and security records revealed that Lohmeier swiped into the equipment room around the time both medications were taken. Lohmeier swiped into the equipment room at 3:21:45 p.m. and 7:42:08 p.m. The morphine was pulled at 3:21:20 p.m., and the fentanyl at 7:41:44 p.m. Daniels and Hook testified that they knew the Pyxis machine clock was one to two minutes behind the security system clock. So, although Lohmeier appeared to swipe into the room seconds *after* the Pyxis dispensed the medications, Daniels and Hook interpreted the records to mean that Lohmeier entered the room a minute or so *before* the medications were taken. Lohmeier does not dispute that Hook knew the clocks were not synced and that it appeared from the records that she was in the room around the time both medications were removed.

In addition to interviewing witnesses and gathering access records, members of the committee also met with Lohmeier. They informed her that, according to the security logs, she appeared to be the only person who was in the equipment room around the time both medications went missing. Lohmeier explained that she had repeatedly entered the equipment room during the shift to look for medication labels. Regarding the positive drug test, she explained she took prescribed opiates the night before her shift. Lohmeier provided a copy of her Norco prescription. The hospital's medical review officer later deemed Lohmeier's positive drug test result void because the prescribed Norco could explain the result. At some point after the meeting, Kirk followed up with Lohmeier about the tube insertion allegations. Lohmeier denied the allegations and said that Wolak was lying.

Based on the committee's investigation, the Hospital concluded that Lohmeier had violated the drug and alcohol use policy by being under the influence of opiates while working, had been unfit for duty, and had exhibited unsafe behavior. The Hospital also determined that Lohmeier had likely stolen the missing morphine and fentanyl.

On November 2, two of the committee members, Hook and Kirk, along with nurse manager Tarleda Mansfield, met with Lohmeier. Hook later testified that Lohmeier could have kept her job if, during this meeting, she had acknowledged that she needed help and agreed to continue with the employee assistance program. Instead, during the meeting, according to Hook, Lohmeier stated she was unwilling to participate in the employee assistance program. Lohmeier, for her part, recalls a five-minute meeting that consisted of Hook reading the termination decision and reminding Lohmeier

that she could access the employee assistance program for 30 days. Regardless, the parties agree that Lohmeier was fired at that meeting. Hook, the decision maker, stated that she terminated Lohmeier's employment due to concerns that Lohmeier had likely diverted the missing medications, violated the drug and alcohol use policy, and engaged in unsafe patient care. Six days later, Hook submitted a Nursing Mandatory Report to the Illinois Department of Finance and Professional Regulation. The report summarized the events of October 12 and the reasons for Lohmeier's termination.

### D. Family Medical Leave Act Request

The day before her termination, Lohmeier applied for leave under the Family Medical Leave Act (FMLA). The FMLA form provided by the hospital instructed that non-specific answers about the frequency and duration of the condition, including "'unknown' or 'indeterminate' may not be sufficient to determine FMLA coverage." Lohmeier's application, which included a medical assessment from Dr. William H. Gros, contained several vague responses. Dr. Gros listed the possible duration of her condition and associated leave, for instance as "To Be Determined." Regarding whether her condition would prevent her from performing her job, Dr. Gros stated, "We Don't Know." After her termination, the Hospital closed her leave request and removed the preliminary FMLA flag from her file.

### E. Appeal of Termination

The Hospital provided a formal three-step process for an employee to contest their termination. On November 6, Lohmeier submitted a Step 1 complaint appealing her termination as discriminatory. Because the Hospital was unable to

respond within the allotted timeframe, it escalated her complaint to Step 2 review. Hook gave Lohmeier a Step 2 response, stating that the security access reports showed that Lohmeier badged into the medication room close to when the morphine and fentanyl went missing, numerous co-workers reported Lohmeier appeared unfit for duty, and other staff reported that she endangered a patient.

Lohmeier then requested Step 3 review. Per policy, a three-member panel convened to review the complaint. At the hearing, she had ten minutes to present her case and Daniels had ten minutes to give a rebuttal. The panel reviewed documents from the investigation, including witness statements and the Pyxis logs. The panel upheld her termination, explaining that Lohmeier had not presented a plausible reason for her observed decline in behavior and that security access logs showed Lohmeier had twice entered the equipment room for no documented reason.

### F. Additional Evidence and Lawsuit

Lohmeier testified during her deposition that Wolak and Wolak's friends at the hospital held anti-Hispanic biases. Lohmeier overheard Wolak making derogatory comments saying, "Hispanics are always needy and … always, you know, demand more care than others. … [And] are unreasonable with their family members in the hospital."

After her termination, Lohmeier experienced weight loss, severe social anxiety, panic attacks, and deep depression. She testified that she was "not able to function." She sued the Hospital for Title VII discrimination and retaliation based on her color and national origin, disability discrimination and failure to accommodate under the Americans with Disabilities Act

(ADA), FMLA interference and retaliation, and Illinois Human Rights Act (IHRA) violations. The district court granted summary judgment to defendants on all counts. Lohmeier appeals that decision.

## II

We review a summary judgment decision de novo. *Johnson v. Accenture LLP*, 142 F.4th 536, 542 (7th Cir. 2025). Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We begin with Lohmeier's Title VII claims before turning to her ADA, FMLA, and IHRA claims.

### A. Title VII Claims

Title VII forbids an employer from discharging an individual on account of her color or national origin. 42 U.S.C. § 2000e–2. Likewise, an employer may not retaliate against an employee for protesting employment discrimination. 42 U.S.C. § 2000e–3(a). We first discuss Lohmeier's discrimination claim and then her retaliation claim.

### 1. Color and National Origin Discrimination

Lohmeier pursues her claims under both the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and the *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), frameworks. We assess each. *See Wince v. CBRE, Inc.*, 66 F.4th 1033, 1041 (7th Cir. 2023).

Under the *McDonnell Douglas* approach, a plaintiff must first establish a prima facie case of discrimination with evidence that: "(1) she is a member of the protected class; (2) she met her employer's legitimate job expectations; (3) she

suffered an adverse employment action; and (4) similarly sit-
uated employees outside of the protected class were treated
more favorably." *Naficy v. Ill. Dep't of Hum. Servs.*, 697 F.3d
504, 511 (7th Cir. 2012). After a plaintiff establishes a prima
facie case, the burden shifts to the employer to articulate a "le-
gitimate, nondiscriminatory reason for the employment ac-
tion." *Id.* If the employer does so, the plaintiff has the burden
to show the articulated reason is pretextual. *Id.*

Even assuming Lohmeier meets her burden on the first
three prongs, she does not show the existence of similarly sit-
uated employees and accordingly cannot make out a prima
facie case. While "congruence need not be perfect," the plain-
tiff needs to show that comparator employees were "engaged
in similar conduct without such differentiating or mitigating
circumstances as would distinguish their conduct or the em-
ployer's treatment of them." *See Lesiv v. Ill. Cent. R.R. Co.*, 39
F.4th 903, 919 (7th Cir. 2022).

Lohmeier argues that every ICU nurse on duty that day
was similarly situated to her and treated more favorably by
not being subjected to an investigation and fitness for duty
exam. It is true that the other nurses had the same supervisors,
similar job duties, and access to the Pyxis machine. *See Donley
v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) (explain-
ing a comparator usually needs to have "dealt with the same
supervisor, been subject to the same standards, and have en-
gaged in similar conduct" (citation modified)).

But Lohmeier's observed disoriented behavior creates a
critical "differentiating" circumstance. *See Lesiv*, 39 F.4th at
919. It is undisputed that several staff reported to supervisors
that Lohmeier looked tired, dazed, and out of sorts. Lohmeier
admitted that she felt tired that day, and that no one else

appeared sleepy or under the influence of narcotics. Because Lohmeier's observed behavior differentiates her from all of her proposed comparators, she fails to meet her prima facie burden under *McDonnell Douglas*. Accordingly, we turn to *Ortiz.*

Under *Ortiz*, a court must determine whether, considered as a whole, the plaintiff's evidence would permit a reasonable factfinder to conclude that the plaintiff's protected characteristic "caused the discharge or other adverse employment action." 834 F.3d at 765. We organize Lohmeier's evidence that her color or national origin caused her termination into five groups: (a) improprieties in the initial investigation; (b) policy violations; (c) false claims; (d) deprivation of a meaningful grievance process; and (e) co-workers' discriminatory animus.

### a. Improprieties in the initial investigation

First, Lohmeier argues that the Hospital targeted her in the investigation, did not investigate other staff, humiliated her by ordering she submit to a fitness for duty exam, and otherwise engaged in a "sham" investigation. The record does not support her arguments. It is undisputed that Daniels spoke to every nurse on duty about the missing morphine, and then again about the missing fentanyl. As discussed above, Lohmeier was the only nurse whose behavior was noticeably abnormal during the shift, which explains the demand that only she submit to a fitness for duty exam.

That Saccameno and Daniels asked Lohmeier about the exam in a location where two co-workers overheard also does not support an inference of animus. Lohmeier does not connect the decision to approach her at the main nursing desk to

any direct or circumstantial evidence of bias or evidence that her protected characteristics caused that decision.

Similarly, Lohmeier argues that two comments from her co-workers suggest a sham investigation. One comment was that the second missing drug was "the final nail in [Lohmeier's] coffin" and the other comment was that the missing-drug spectacle would turn out "okay" for the nurse whose credentials were used to dispense the drugs. But again, Lohmeier does not connect the comments to anything that would suggest bias in the investigation.

### b. Policy violations

Second, Lohmeier argues the Hospital violated policy by delaying its investigation, instructing Lohmeier to complete patient care, and allowing her to drive home. Hospital policy required that a nursing supervisor "immediately respond" when the Hospital believed a nurse violated the drug and alcohol use policy. And that is exactly what happened here. Daniels, the lead nurse, learned of the missing morphine around 6:30 p.m. Daniels then met with Saccameno, the nursing supervisor, about the missing morphine at 6:45 p.m. The record is not clear as to exactly when Daniels and Saccameno approached Lohmeier, but it is undisputed that by 8:30 p.m., they had met with Lohmeier, escorted her to the ER, organized Amas's initial assessment of Lohmeier, and arranged for Lohmeier to meet with Dr. Ball. These undisputed facts show an immediate response.

Lohmeier is right that the Hospital violated its policy by directing her to finish her charting and allowing her to drive home. Hospital policy required that any employee suspected of being unfit for duty be released to a family member or sent

home in a cab. The Hospital did not do so here, which is some evidence in support of Lohmeier's argument that the Hospital did not sincerely believe that she was unfit. However, this deviation from policy is not enough on its own to avoid summary judgment. *See Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012) (explaining minor deviation from written policies are "insufficient to avoid summary judgment" without supporting circumstantial evidence). So, we take note of the policy violation as some evidence in Lohmeier's favor and continue evaluating her other evidence.

### c. False claims

Third, Lohmeier contends the Hospital wrongly claimed that Lohmeier was the "only person" in the equipment room and filed a false Nursing Mandatory Report. The first contention is a misstatement of the record. Lohmeier's citations show the Hospital stating that, according to the Pyxis records, Lohmeier *appeared* to be in the medication room around the time the morphine was taken.

As for the Nursing Mandatory Report, Lohmeier argues that the report was false, contained hearsay, and lacked exculpatory information. A plaintiff can raise an inference of pretext "when an employer enforces a policy in an objectively unreasonable way." *Huff v. Buttigieg*, 42 F.4th 638, 648 (7th Cir. 2022). But Lohmeier does not explain what aspect of the report was false. The report asked for a brief statement of the basic facts, which Hook provided in two paragraphs, and did not require that the information be non-hearsay or include Lohmeier's perspective. Given the scope of the report, omitting details that Lohmeier believed would be mitigating and including witness observations (which Lohmeier describes as hearsay) was not an "objectively unreasonable" execution of

the report. As such, Lohmeier's criticisms of the report do not give rise to a reasonable inference that her national origin or color caused the investigation and termination. *Cf. Huff*, 42 F.4th at 648–49 (issuance of "noncompliance memo" could be objectively unreasonable where an employee was not expressly prohibited from taking the action at issue).

### *d. Deprivation of a meaningful grievance process*

Fourth, Lohmeier argues that during her termination appeal, the Hospital deprived her of a meaningful grievance process, misclassified the results of her drug test, and ignored Dr. Ball's medical opinion.

Lohmeier does not explain how she, as opposed to any other employee utilizing the complaint procedure, was deprived of a fair grievance process. She notes that she "had just ten minutes to tell her side, and she was not permitted to present her own witnesses, address her accusers, cross-examine witnesses, or rebut the Hospital's presentation." But the Hospital appears to have followed the standard grievance procedure, and Lohmeier presents no evidence to the contrary.

Lohmeier also does not explain how the Hospital deviated from policy or otherwise exhibited bias in how it classified her drug test or used Dr. Ball's report. As for the drug test, it is undisputed that the Hospital treated it as negative because Lohmeier had taken prescribed drugs that could explain the result. As for Dr. Ball's report, Kirk testified that the result of an employee fitness for duty exam like the one Dr. Ball completed would not be sent to human resources (for the termination and review proceedings) but rather would remain with the employee health team. We agree with Lohmeier that it is odd the Hospital would have a process to assess an

employee's fitness for duty and then not consider the results of that assessment in termination proceedings based on an employee's unfitness for work. But Lohmeier does not provide any evidence to dispute Kirk's testimony that the Hospital followed its own policy. And it is not our role in this case to review the processes an employer has chosen to implement. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006).

### *e. Co-workers' discriminatory animus*

Lastly, Lohmeier argues that Wolak and Brzezinska's bias against her, as evidenced by their anti-Hispanic comments, infected the investigation. However, Wolak and Brzezinska's derogatory comments cannot be imputed to the Hospital. To impute bias from Wolak and Brzezinska to the Hospital, Lohmeier must show that Wolak and Brzezinska were a proximate cause of Lohmeier's termination. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017). There is no proximate cause where the adverse action was "not wholly dependent on a single source of information and [the employer] conduct[ed] [its] own investigation into the facts relevant to the decision." *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) (citation modified). Lohmeier cannot show that Wolak and Brzezinska proximately caused her termination because the Hospital conducted its own investigation and was not "wholly dependent" on the reports from Wolak and Brzezinska. The record shows the Hospital received statements from Irving, Daniels, Saccameno, Amas, and Dr. Ball that Lohmeier looked off or disoriented. Plus, the Hospital pulled the security logs. As such, Lohmeier cannot show that the Hospital was "wholly dependent" on Wolak and

Brzezinska's reports of Lohmeier's behavior and she cannot impute their bias to the Hospital.

Although Lohmeier presented evidence of a small deviation from a written policy, that alone is insufficient for a reasonable factfinder to conclude Lohmeier's national origin or color caused her termination. Thus, her Title VII discrimination claims fail.

### 2. Retaliation

Lohmeier argues that the Hospital retaliated against her for appealing her termination through the employee grievance process. For a Title VII retaliation claim to survive summary judgment, a reasonable jury must be able to find that: (1) Lohmeier engaged in Title VII protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Lesiv*, 39 F.4th at 911. Lohmeier submits that her protected activity is her Step 1 appeal of the termination, which alleged discrimination. She identifies two adverse actions: deprivation of a meaningful grievance procedure and submission of Hook's Nursing Mandatory Report.

Even assuming Lohmeier can meet her burden on prongs one and two, she is unable to show that the "unlawful retaliation would not have occurred in the absence" of her utilization of the grievance procedure. *Lesiv*, 39 F.4th at 915 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). She states that "review procedure[s] were all but ignored, and … [the] fact-finding conference was a sham," but she provides no evidence of how the employee grievance process deviated from the established procedures. *See Hanners*, 674 F.3d at 695. And as discussed above, neither the contents nor the filing of

the Nursing Mandatory Report were objectively unreasonable. *See Huff*, 42 F.4th at 648.

Because Lohmeier does not meet her burden to show that the grievance procedure or Hook's report would have been different had she not appealed her termination, the Title VII retaliation claim must also fail.

**B. ADA Claims**

**1. Discrimination**

To make out an ADA discrimination claim, Lohmeier must show that she was disabled. *See Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (addressing claims under 42 U.S.C. § 12112(a) of the ADA). Disability under the ADA is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment … ." *See* 42 U.S.C. § 12102(1).

Lohmeier argues she was disabled under the ADA for two reasons: (1) she had shingles with severe pain, and (2) after her suspension, she suffered a resurgence of her severe PTSD, anxiety, and depression (which she initially developed after her military deployment to Iraq). However, Lohmeier does not explain what "major life activity" was limited by her stated disabilities. *See* 29 C.F.R. § 1630.2(i) (noting that caring for oneself, performing manual tasks, seeing, walking, speaking, hearing, breathing, learning, and working, are "major life activities"). Nor does she provide a record of impairment or evidence that she was regarded as having an impairment. Accordingly, she cannot show that she was disabled under the ADA and her claim must fail.

### 2. Failure to Accommodate

An employee must be disabled under the ADA to make out a failure to accommodate claim. *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). As such, Lohmeier's failure to accommodate claim also fails.

### C. FMLA Claims

### 1. Interference

An employee applying for FMLA must give fair notice of the request, including, among other things, their "serious health condition" and an estimate of when they will return to work. *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001). Lohmeier submitted a sparse FMLA application that did not include what her serious medical condition was or when she would likely return to work. *See Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 312 (7th Cir. 1998) (explaining an employee must still give their employer notice when the employer generally knows that there is an ongoing medical issue). Thus, Lohmeier cannot carry her burden to show she was entitled to leave, so this claim fails.

### 2. Retaliation

To make out an FMLA retaliation claim, Lohmeier must show that her FMLA request was the "but-for" cause of her termination. *See Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020) (explaining that to prove FMLA retaliation, a plaintiff would need to "establish a[] causal connection between his alleged attempt to seek relief under the FMLA and his discharge"). Lohmeier argues that the record shows she was approved for leave but then inexplicably denied leave. This inconsistency plus the close timing between her request for leave and her termination, Lohmeier argues, is enough for

a jury to conclude the Hospital fired her because she applied for FMLA leave.

The record does not corroborate Lohmeier's argument that her FMLA request was approved and then retroactively rejected. While suspended, Lohmeier requested FMLA forms. Human resources mailed her the forms and updated her time-card with a preliminary FMLA flag. The day after Lohmeier returned the forms, the assigned human resources adminis-trator contacted Kirk to ask how to proceed with the applica-tion because Lohmeier was suspended. Kirk instructed the administrator to remove the FMLA flag and close the request because Lohmeier had been terminated that day. Lohmeier does not point to anything in the record to dispute Kirk's ex-planation about how human resources processed her FMLA request, or to suggest her FMLA request caused her termina-tion.

That leaves timing. Lohmeier applied for FMLA while suspended and under investigation, just one day before the Hospital fired her. Given the lack of other evidence to support her FMLA retaliation claim, however, the timing of her termi-nation is insufficient for a reasonable jury to conclude her FMLA request caused her termination. *See id.* (stating that "suspicious timing by itself rarely is enough to overcome summary judgment").

### D. IHRA Claim

Because Lohmeier's Title VII and ADA claims fail, so does her IHRA claim. *See Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022) (explaining Title VII and IHRA discrimination claims "rise or fall together"); *see Tate v. Dart*, 51 F.4th 789, 793

(7th Cir. 2022) (IHRA claims are "practically indistinguishable from the ADA framework").

### III

The Hospital terminated Lohmeier on suspicion of misappropriating drugs and engaging in unsafe patient care. Whether that decision was right or wrong is not before us. Rather, we hold that, based on the record before us, Lohmeier has not presented sufficient evidence that the Hospital violated any law. We affirm the district court's decision to grant summary judgment to the Hospital on all claims. Additionally, because we affirm that decision, Lohmeier's motion for a new judge on remand is denied as moot.

AFFIRMED